NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0249n.06
Filed: April 4, 2005

No. 03-3946

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JULIE M. GARVEY and KENNETH D. CLARK, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| ROBERT G. MONTGOMERY and FRANKLIN COUNTY RECORDER'S OFFICE, | ) ) ) ) | |
| Defendants-Appellees. | ) ) | |

Before: BATCHELDER and GIBBONS, Circuit Judges; and STAFFORD, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Soon after being elected recorder of Franklin County, Ohio, in 2000, defendant-appellee Robert Montgomery discharged plaintiffs-appellants Julie M. Garvey and Kenneth D. Clark from their positions in the Franklin County Recorder's Office ("Recorder's Office"). Plaintiffs filed suit against Montgomery and Franklin County under 42 U.S.C. § 1983, asserting that Montgomery fired them because of their political affiliation in violation of the First Amendment. The district court granted defendants summary judgment, which the plaintiffs now appeal. For the following reasons, we affirm the judgment of the district court.

---

[*]The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

**I.**

Garvey and Clark first joined the Recorder's Office during the administration of county recorder Richard Metcalf. As recorder, Metcalf was responsible for recording and indexing various legal instruments for the county, including deeds, mortgages, powers of attorney, and plats. Ohio Rev. Code § 317.08 (2002). In October 1999, Metcalf announced that he would not seek re-election to a third term. At that time, Garvey worked as his Administrative Officer,[1] and Clark worked as his Electronic Data Management Department supervisor. Daniel J. Nichter served as Metcalf's Chief Deputy.

Later that October, with Metcalf's support, Nichter launched a bid to replace Metcalf as Franklin County recorder. Montgomery likewise initiated a campaign to secure the post. In December 1999, prior to the party primaries, each sought the endorsement of the Republican Party at a meeting of its State Central Committee. Clark and Garvey attended the meeting, which was public and well-attended, wearing "Dan Nichter for Recorder" shirts. They also distributed Nichter campaign literature. Clark even attempted to hand Nichter campaign materials to Montgomery's wife, whom he did not know. In any event, Montgomery claims that at the time of the meeting, he did not know Clark or Garvey or that they worked in the Recorder's Office. Ultimately, after convening in a closed-door executive session, the party's Administrative Screening Committee –

---

[1]At various times, the position has also been referred to as the Office Manager. The parties do not dispute that the Office Manager and Administrative Officer positions are functionally equivalent. For the sake of consistency, the position will be referred to throughout this opinion as the Administrative Officer position.

which was responsible for selecting which candidates would receive the state party's endorsement for elected administrative offices – decided to endorse Montgomery for Franklin County recorder.

Despite losing the party's endorsement, Nichter took steps to qualify as a candidate for recorder against Montgomery in the party primary. To do so, Nichter had to secure a certain number of signatures on a petition. Garvey assisted Nichter in this endeavor. Nichter eventually obtained a sufficient number of signatures and qualified as a candidate for recorder. However, at the last moment, he withdrew from the race. He later resigned from his post in the Recorder's Office in May 2000, at which point Garvey essentially began managing the office.

Confident of his prospects in the general election, Montgomery began volunteering part-time for Metcalf in the Recorder's Office during the summer of 2000 in an effort to survey its operations. To enable Montgomery to run as an incumbent, Metcalf then resigned in September 2000, and Montgomery was appointed as interim recorder, pending the outcome of the approaching election. Upon assuming office, Montgomery informed Garvey, who was managing operations, that he did not intend to alter office procedures prior to the election. He did, however, appoint Brad Hennebert as his Chief of Staff, which was equivalent to the position held by Nichter prior to his resignation. The move effectively confined Garvey's duties to those she held prior to Nichter's resignation. As Chief of Staff, Hennebert did not implement widespread changes in the office prior to the election but instead used that time to learn about the office's operations; in fact, he met with Garvey on several occasions for precisely that purpose.

Montgomery was officially elected recorder of Franklin County in November 2000. Soon thereafter, on December 8, 2000, he discharged Garvey and Clark. Garvey was replaced by Joseph P. Raymer, and Clark was replaced by Jan Lamm.

On November 7, 2001, Garvey and Clark filed suit against Montgomery (in his official and individual capacities) and the Recorder's Office in the United States District Court for the Southern District of Ohio. Both alleged under 42 U.S.C. § 1983 that defendants discharged them on account of political affiliation in violation of the First Amendment. Plaintiffs subsequently amended their complaint to substitute Franklin County as a defendant in lieu of the Recorder's Office. Defendants filed a motion for summary judgment on March 31, 2003, which the district court granted on June 23, 2003. With respect to Garvey, the court found that even if she had been discharged on account of her political affiliation, she was not entitled to relief under the First Amendment, because political affiliation was an appropriate employment consideration for the position from which she was fired. As for Clark, the court found that, although he presented evidence that political affiliation was a motivation for his discharge, he could not show that the justification offered by defendants for the discharge was "pretextual." Plaintiffs filed a timely notice of appeal.

## II.

This court reviews a district court's grant of summary judgment *de novo*. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 539 (6th Cir. 2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When evaluating a motion for summary

judgment, the court must view the evidence in the light most favorable to the nonmoving party, who nonetheless "must show sufficient evidence to create a genuine issue of material fact." *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003); *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If a reasonable jury could not return a verdict for the nonmoving party on the basis of the evidence as construed in its favor, summary judgment should be granted to the movant. *See Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

With *Elrod v. Burns*, 427 U.S. 347 (1976), the Supreme Court established that the First Amendment generally prohibits a public employer from discharging a public employee on account of her political affiliation. Proceeding under 42 U.S.C. § 1983, Clark and Garvey claim that defendants violated their respective rights against political discharge. In order to succeed on a § 1983 claim, a plaintiff must prove (1) that she was deprived of a right guaranteed by the Constitution or laws of the United States and (2) that a person acting under the color of state law caused the deprivation. *Baker v. Hadley*, 167 F.3d 1014, 1017 (6th Cir. 1999). It is clear that Montgomery acted under the color of state law in discharging Clark and Garvey. The question is whether either's discharge involved the deprivation of a First Amendment right.

**A.**

The district court granted defendants summary judgment on Clark's political discharge claim on the ground that, although Clark could show that his discharge was motivated by political considerations, he "failed to establish that defendants' nonpolitical reasons for terminating him were

a pretext." Clark's first challenge to this holding is that, in political discharge cases under the First

Amendment, it is improper to impose on the plaintiff the burden of proving that a defendant's

proffered explanation for his discharge is pretext once the plaintiff has already shown that political

affiliation was a substantial or motivating factor behind the discharge. We agree with Clark on this

point.

> The district court described the analysis applicable in political discharge cases as follows:

> For Clark to establish that he was terminated based on his political affiliation, he must make a prima facie case of patronage dismissal. In order to establish a prima facie case of patronage dismissal in violation of his First Amendment rights, plaintiff must show that the adverse employment action in question was the result of his political affiliation. To establish the required causal connection, plaintiff must show that his political affiliation was a "substantial" or "motivating" factor behind the adverse employment action. . . . If Clark meets this burden, the burden then shifts to the defendants to articulate a nondiscriminatory ground for the adverse action and to prove by a preponderance of the evidence that the adverse action would have been taken regardless of Clark's political affiliation. *If the defendants present politically-neutral reasons for the termination of Clark, then Clark can present evidence to rebut the defendants' nondiscriminatory reason for the discharge*.

(Emphasis added; citations and alterations omitted.) After finding that Clark had presented a prima

facie case and that defendants had provided a nondiscriminatory justification for his discharge, the

court stated that, "[b]ecause the defendants have asserted nondiscriminatory grounds for the

discharge of Clark, *the burden shifts back to Clark* to present evidence that the reasons offered are

merely a pretext." (Emphasis added.) Finally, the district court granted summary judgment to

defendants on Clark's political discharge claim because Clark "failed to establish that defendants'

nonpolitical reasons for terminating him were a pretext."

The approach employed by the district court closely mirrors the standard, first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for analyzing discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, that are predicated on indirect evidence. To succeed on such claim, a plaintiff must first demonstrate a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If a plaintiff meets this burden, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the challenged adverse employment action. *Id.* The defendant need only produce a legitimate, non-discriminatory reason; it need not persuade the court that this reason actually motivated the employment actions in question. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000). Once the defendant meets its burden of producing a legitimate, non-discriminatory reason for its challenged action, the burden shifts to the plaintiff to demonstrate that the asserted justification is mere pretext for discriminatory motives. *Sutherland*, 344 F.3d at 615. At all times the plaintiff bears the ultimate burden of persuading the trier of fact that the adverse employment action in question was motivated by discriminatory intent. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 768 (6th Cir. 2004).

Although perhaps similar in certain respects, the *McDonnell Douglas* analysis is distinct from the analysis that applies in political discharge cases. To succeed on a political discharge claim, a plaintiff bears the initial burden of proving that (1) he was discharged; (2) he engaged in activity protected by the First Amendment; and (3) a causal connection existed between the two. *See Heggen v. Lee*, 284 F.3d 675, 681 (6th Cir. 2002); *Sowards v. Loudon County*, 203 F.3d 426, 431 (6th Cir. 2000); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)

(explaining that a public employee claiming he suffered an adverse employment action in retaliation for engaging in protected First Amendment conduct bore the initial burden of proving that he engaged in constitutionally protected conduct and that this conduct was a substantial or motivating factor in his employer's decision not to rehire him). In the political discharge context, protected activity most commonly includes adopting certain political beliefs, supporting a particular political candidate, or affiliating with a political party or group.[2] *See Lucas v. Monroe County*, 203 F.3d 964, 975 (6th Cir. 2000) ("The First Amendment prohibits government officials from making employment decisions, such as hiring or firing, based on the employee's political beliefs, affiliation, or support."). A plaintiff successfully demonstrates a causal connection between his discharge and his act of political affiliation by offering direct or circumstantial evidence indicating that this particular act of political affiliation was a substantial or motivating factor behind the plaintiff's discharge. *See Kreuzer v. Brown*, 128 F.3d 359, 363 (6th Cir. 1997). If a plaintiff meets his initial burden, the defendant has the opportunity to demonstrate by a preponderance of the evidence that the plaintiff would have been discharged notwithstanding his political affiliation. *Id*. at 363 (citing *Mt. Healthy*, 429 U.S. at 287). If the defendant cannot make such a showing, the plaintiff has succeeded in proving that she was discharged on account of her political affiliation.

While in the Title VII context the plaintiff always bears the burden of persuading the trier of fact that discriminatory motives animated an adverse employment action, *Burdine*, 450 U.S. at 256, "in a First Amendment retaliation case, once a plaintiff shows that her constitutionally

---

[2]For ease of analysis, we refer to these protected actions collectively as acts of political affiliation.

protected conduct was a substantial factor in an adverse employment decision, the burden of persuasion shifts to the defendant to show by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct." *Sowards*, 203 F.3d at 431 n.1 (quotation and alteration omitted); *see also id.* (expressly rejecting use of the Title VII burden-shifting scheme in the First Amendment context); *Brady v. Fort Bend County*, 145 F.3d 691, 711 (5th Cir. 1998) (noting the lack of "authority for the proposition that the *McDonnell Douglas* burden-shifting framework is applicable to patronage dismissal and free-speech retaliation cases"); *Kreuzer*, 128 F.3d at 365 n.1 (Moore, J., dissenting) ("[U]nlike employment discrimination cases under Title VII, the plaintiff in a First Amendment political discharge case does not retain the burden of proof once he or she has presented sufficient evidence that [political affiliation] was a substantial or motivating factor in the adverse employment decision. The public employer has the burden to prove, by a preponderance of the evidence, that the same decision would have been made in the absence of the political conduct.") (citations omitted). As further explained by the First Circuit in *Jirau-Bernal v. Agrait*, 37 F.3d 1, 3-4 (1st Cir. 1994):

> First Amendment political discrimination claims are not subject to the Title VII burden-shifting device. Whereas a Title VII claimant retains the burden of proof throughout, even after the burden of limited *production* has shifted to the Title VII defendant to assert a nondiscriminatory motivation for the challenged action, in the First Amendment context [plaintiffs] successfully foist[] the burden of proof onto . . . defendants simply by meeting [their] own threshold burden of persuasion.

Once this shift occurs, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant. *See Burchett*, 310 F.3d at 942; *see also Jirau-Bernal*, 37 F.3d at 4 ("Summary judgment would have

been warranted, in other words, only if defendants' evidentiary proffer compelled the finding that political discrimination did not constitute a 'but for' cause for the demotion.").

Thus, by applying the *McDonnell Douglas* burden-shifting framework to Clark's political discharge claim, the district court employed the wrong legal standard.[3] It was improper for the court to impose any burden on Clark once it determined that he had presented evidence sufficient to show that his political motivation at least partially motivated his discharge. Once he met that burden, the burden was squarely on defendants to demonstrate that Clark would have been fired notwithstanding his political motivation.

In this case, Clark clearly engaged in protected activity by campaigning for and supporting Nichter at the Republican Party's State Central Committee meeting. *See Sowards*, 203 F.3d at 432 (stating that "[s]upport of a political candidate falls with the scope of the right of political association" protected by the First Amendment). It is also clear that Clark was discharged from employment. The initial issue on appeal is whether there is sufficient evidence that these two occurrences are causally connected to preclude granting summary judgment for defendants. *See id*. at 433.

---

[3]Defendants contend that plaintiffs cannot challenge the district court's utilization of the *McDonnell Douglas* framework on appeal, because the plaintiffs argued before the district court that the framework is applicable to political discharge claims. Irrespective of the plaintiffs' stance before the district court on the applicable analytical framework, this court reviews whether a district court applied the correct legal standard *de novo*. *Chao v. Hosp. Staffing Servs., Inc.*, 270 F.3d 374, 381 (6th Cir. 2001). Therefore, we are free to scrutinize without limit the district court's legal analysis.

The district court found that Clark could show that Montgomery's decision to discharge him was motivated at least in part by Clark's support for Nichter based on the testimony of Montgomery's former secretary in the Recorder's Office, Treasure Anderson. Anderson testified that, prior to the general election,[4] she informed Montgomery that she had reason to believe that Garvey and Clark intended not to vote for him in the general election, to which Montgomery responded, "Well, you know, those people then will go do something else then," and, "If they don't want to come on board, they won't be here long." Anderson also attested that Hennebert, Montgomery's chief of staff, stated more generally that those who did not support Montgomery in the election "will be dealt with, those kind of people don't need to be [in the Recorder's Office]."

We question whether these statements can support a finding that Clark was discharged at least in part because of his support for Nichter. The statements were in reference only to persons who were inclined not to support Montgomery in the general election and were not aimed at persons who had supported Nichter at the state central committee meeting. And there is no evidence that Clark actually supported Lori Tyack, Montgomery's general election opponent, or opposed Montgomery in the general election. These facts present an odd scenario in which there is evidence that the defendant possessed an impermissible motive in discharging the plaintiff, but there is no evidence that the plaintiff actually engaged in the protected conduct the defendant supposed that he had. Given this unusual state of the record, we decline to address whether impermissible motives are sufficient to bring a political discharge claim, or whether the plaintiff must show that the motives

---

[4]It is unclear from the record whether this conversation occurred while Montgomery was serving as interim recorder or before, when he was volunteering in the Recorder's Office.

were aimed at protected conduct actually undertaken by the plaintiff. Rather, we assume, *arguendo*, that Clark could meet his initial burden of showing that political considerations were a motivating factor behind the decision to discharge him and turn to the next step of the political discharge analysis.

The defendants have presented evidence demonstrating that Clark would have been discharged irrespective of his political affiliation; indeed, the evidence is such that no reasonable juror could find for Clark on this issue. *See Kreuzer*, 128 F.3d at 363 ("If plaintiff meets her burden, the burden then shifts to the defendant to prove that the employment decision would have been the same even without political considerations."); *see also Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) (stating that in a First Amendment retaliation claim, "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct"). In other words, Clark has failed to present evidence creating a genuine issue of material fact on this issue. Summary judgment for defendants was therefore appropriate.

Defendants assert that, even if Montgomery discharged Clark in part because of his political affiliation, Clark would have been discharged anyway because of his poor work performance. Montgomery became concerned about Clark's past performance as supervisor of the Electronic Data Management Department after Hennebert, his chief of staff, met with Clark on October 5, 2000. Hennebert told Montgomery, and later reported in a memorandum regarding Clark, that Clark interrupted the meeting twice by accepting lengthy personal phone calls on his cellular phone. Although Clark denies making personal phone calls during the meeting, he does not deny that he received such phone calls.

According to Montgomery, Clark's lack of professionalism during his meeting with Hennebert prompted Hennebert to review Clark's personnel file. Included in the file was a memo written from Garvey to Nichter on May 27, 1999. The memo stated that Clark "spends too much time away from the department and on the telephone." The memo also indicated that Clark was not managing department assignments well. Finally, the memo noted that Clark had yet to complete any work on a department reference manual he was directed to finish, and it ordered him to complete the manual before August 1, 1999. Clark's personnel file also included a memo dated September 16, 1999, from Nichter to Clark. This memo notified Clark that his telephone privileges were being suspended indefinitely because of his failure to concentrate on his job. Clark had apparently also missed the August 1, 1999, deadline for completing the department manual, because the memo directed him to complete the manual by October 30, 1999.[5]

Garvey drafted another memo to Nichter regarding Clark on January 7, 2000. Clark's department was responsible for registering veteran grave sites, but the memo reported that the department had not registered any sites since the prior summer. Clark apparently explained to Garvey that the department was overworked, but Garvey dismissed this explanation in the memo by noting that the department staff often left work thirty minutes too early. Garvey also reported that Clark was supposed to take over certain duties from another Recorder's Office employee but did not do so. Clark's only explanation for this failure was that he did not know how to do the work.

---

[5]A memo dated September 30, 1999, from Garvey to Clark imposes an October 15, 1999, deadline on Clark for completion of the manual and indicates that Clark had done some work on the project.

Garvey dismissed this excuse as unacceptable because Clark had ignored the duties for eight months without asking anyone for help. In addition, Garvey noted that Clark was not monitoring his staff adequately and that because Clark had not finished the department manual, it was assigned to another employee.

Finally, in a memorandum to the file dated December 1, 2000, and copied to Montgomery, Hennebert summarizes the contents of Clark's personnel file and describes Clark's actions during his previous meeting with Hennebert. Of that meeting and other interactions with Clark, Hennebert wrote:

> One call was approximately 10 minutes long, and Mr. Clark finally told his wife he had to go after I shot him a particularly sharp glance. Upon ending his conversation Mr. Clark did not explain his telephone call practice or offer an explanation. He began showing me the Internet functions of the telephone when I suggested that we get back to work. Mr. Clark is frequently on the telephone when I walk to his office. I can only assume none of these are work-related calls or he would appropriately use a county telephone . . . .

The memo also reported that – after the September 16, 1999, memo – Clark's telephone calls were screened by his assistant supervisor. The memo concluded by questioning the wisdom of allowing Clark to continue as supervisor.

After reviewing all of this information, Montgomery "didn't have that trust, faith, and confidence in [Clark's] ability to perform the very important function that he had within [the Electronic Data Management Department]." Consequently, Montgomery chose to discharge Clark. Clark was informed that he was being discharged because of poor performance.

The evidence of Clark's job performance as supervisor of the Electronic Data Management Department indicates that Clark would have been discharged by Montgomery notwithstanding

Clark's political affiliation. Clark's inability to manage the department effectively, as objectively evidenced by his own personnel record, was more than sufficient to warrant the decision not to retain him; that past managers chose to ignore his poor managerial skills and retain him as a supervisor is simply immaterial. Moreover, Clark admitted that he was told that his performance was the basis for his dismissal, a basis the defendants have consistently asserted.

Clark unconvincingly argues that a reasonable juror could question whether he was fired because of his past poor performance and that, therefore, a material question of fact remains. In making this assertion, Clark notes that his conduct while meeting with Hennebert was the only improper conduct actually observed while Montgomery served as recorder and that Hennebert did not draft a contemporaneous record of that meeting. Yet, these circumstances have no tendency to raise a fact issue about whether Montgomery would have fired Clark absent protected activity, since Clark admits accepting personal phone calls during the meetings. Similarly, Montgomery's failure to consult with Clark's supervisors about past performance before discharging him and his failure to discharge Clark earlier are of no importance in assessing whether a fact issue on this point exists. Montgomery considered the contents of Clark's personnel file, which included the views of his supervisors, and terminated Clark promptly after his official election.

The final prong of Clark's argument is that Hennebert drafted the memo summarizing Clark's performance deficiencies only after Clark was dismissed and then backdated the memo to December 1, 2000, to provide a post hoc justification for the dismissal. As evidentiary support for this assertion, Clark claims that Hennebert's testimony reveals an inconsistency that proves he

backdated the memo.[6] The memo states that, after being criticized in the September 16, 1999, memo for his telephone usage, "Clark's telephone calls were then screened by his assistant supervisor upon the order of Mr. Nichter." At the time, Jan Lamm served as Clark's assistant supervisor. Asked how he learned that Clark's telephone calls were screened by Lamm, Hennebert testified, "Initially it was from the memoranda that were in Mr. Clark's personnel file, . . . and subsequently I learned that that was her role, and I spoke with [Lamm] about it." He then clarified that he did not speak with Lamm about the matter until after Clark's dismissal.

The memoranda in Clark's personnel file do not indicate that Lamm screened Clark's telephone calls. Clark interprets Hennebert's statement as indicating that the only possible source of Hennebert's knowledge regarding the screening of Clark's phone calls was Lamm herself, and thus the "December 1, 2000," memo – which references the screening of Clark's calls – could only have been written after the discharge. Clark's argument is unavailing. Hennebert's statement does not indicate that the only potential source for his knowledge that Clark's calls were being screened

---

[6]Clark also contends that Hennebert destroyed the computer on which the memo was drafted, thereby demonstrating an attempt by Hennebert to cover his tracks and conceal the fact that the memo was indeed backdated. As his only support for this assertion, Clark cites to a footnote in plaintiffs' memorandum in opposition to defendants' motion for summary judgment, which itself does not cite to any record evidence and reads: "Plaintiffs attempted to have a computer expert inspect the system on which the memorandum was created to establish its creation date, but counsel for defendants have represented . . . that Mr. Hennebert threw the computer away." This court has noted that "a motion for summary judgment may not be defeated by factual assertions in the brief of the party opposing it, since documents of this nature are self-serving and are not probative evidence of the existence or nonexistence of any factual issues." *Banks v. Rockwell Int'l N. Am. Aircraft Operations*, 855 F.2d 324, 325 n.1 (6th Cir. 1988). Since the sole support Clark offers for his allegation that the computer in question was destroyed is precisely such an ungrounded factual assertion, his allegation should be disregarded.

was Lamm.  Rather, Hennebert claims he had three sources for his knowledge: he learned of the screening after reading Clark's file; he then somehow learned that Lamm did the screening; *and* he spoke to Lamm about her role.  Hennebert's testimony that he learned about Lamm's role subsequent to reviewing Clark's file *and* that he spoke with her about it indicates that Lamm was not the only source for this information other than Clark's file.  Furthermore, by stating that "I learned" Lamm screened Clark's telephone calls, Hennebert indicates that this knowledge came from personal observation.  This conclusion is supported by other statements made by Hennebert:

> Mr. Clark did not have a phone in his office.  Miss Garvey had removed it because he was on the phone too much, so he when he [sic] wanted to use his telephone, he had to go out to [Lamm], who was his assistant, and make calls from there, my understanding was, so that [Lamm] could monitor his calls and make sure he wasn't on the phone too much.

Such testimony reveals a level of personal observation and understanding that would enable Hennebert to learn about the screening of Clark's calls.[7]

In conclusion, there is no genuine issue of material fact as to whether Montgomery would have discharged Clark because of his deficient work performance record, notwithstanding his political affiliation.  Therefore, Clark cannot succeed on his political discharge claim.

**B.**

The First Amendment protection against political discharges does not extend to public employees who hold positions in which "an employee's private political beliefs would interfere with

---

[7]In fact, Lamm actually testified that she never spoke to Hennebert about this matter, suggesting that the only source of Hennebert's knowledge regarding the screening of Clark's phone calls was personal observation.

the discharge of his public duties." *Branti v. Frankel*, 445 U.S. 507, 517 (1980). This principle is known as the *Branti/Elrod* exception to the general rule that public employees may not be discharged on account of their political affiliations. *See Justice v. Pike County Bd. of Educ.*, 348 F.3d 554, 559 (6th Cir. 2003). If the plaintiff can show that she was discharged on account of political affiliation, the defendant bears the burden of demonstrating that the position from which the plaintiff was discharged falls within the *Branti/Elrod* exception. *See Heggen*, 284 F.3d at 681.

The district court concluded that Garvey's position fell within the *Branti/Elrod* exception and that she therefore had no First Amendment claim for political discharge.[8] Garvey argues that this finding was in error. We disagree.

In determining whether the *Branti/Elrod* exception applies, "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. This court has identified four broad categories of public positions for which political affiliation may be a permissible consideration: "(1) positions explicitly empowered by law to exercise political discretion; (2) positions not explicitly so empowered, but exercising political discretion by a jurisdiction's pattern or practice; (3) confidential advisors; and (4) positions filled by balancing of political affiliations."

---

[8]In doing so, the court did not address whether Garvey could prove that she was discharged on account of her political affiliation. Apparently, the court either assumed Garvey could meet this burden for the sake of argument or implicitly adopted such a finding.

*Justice*, 348 F.3d at 559-60; *see also McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996) (explaining more fully the nature of these categories).

Although the district court did not expressly state to which of these four categories Garvey's position belonged, it is relatively clear that the court found that the position exhibited characteristics of categories two and three. Categories two and three are defined in reference to category one, which includes "positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted." *Id*. at 1557. In turn, category two "is constructed to recognize that it may be necessary to deny First Amendment protection not just to positions at the very top of any state administrative hierarchy, but in some cases to those occupying levels a bit farther down the hierarchy." *Id*. at 1557 n.31. An example of a category two position is "a deputy secretary of labor in a state, to whom the secretary of labor has delegated the responsibility for crafting the department's annual proposed legislative agenda." *Id.* at 1557. As for category three, it includes employees who either "advis[e] category one or category two position-holders on how to exercise their...authority" or "control the lines of communication" to those position-holders. *Id*. An example of a category three position is "a judge's law clerk or secretary." *Id*. Whether a particular government position falls within one of these categories, thereby making "political affiliation an appropriate consideration" for the position, is a question of law, the resolution of which this court reviews *de novo*. *Shanklin v. Norfolk S. Ry. Co.*, 369 F.3d 978, 985 (6th Cir. 2004); *Sowards*, 203 F.3d at 435.

Discerning whether a government position falls into one of the *McCloud* categories involves examining the duties inherent to the position and the duties of that position as envisioned by an incoming officeholder for whom a person filling that position will work. *See Baker v. Hadley*, 167 F.3d 1014, 1018 (6th Cir. 1999). The ascription of broadly defined duties to a government position makes it more likely that the position qualifies for the *Elrod/Branti* exception. *Hoard v. Sizemore*, 198 F.3d 205, 212 (6th Cir. 1999); *see also Elrod*, 427 U.S. at 368 (stating that "[a]n employee with responsibilities that are not well defined or are of broad scope more likely functions" in a position for which political affiliation is an appropriate consideration). The testimony of a person who has held the position in question may also be considered when evaluating the duties inherent to that position. *Hoard*, 198 F.3d at 213. However, a distinction exists between the duties inherent to a position and the tasks actually performed on the job by someone in that position. *See, e.g., Williams v. City of River Rouge*, 909 F.2d 151, 154-55 (6th Cir. 1990) (finding that, even if plaintiff who served as city attorney performed largely ministerial functions in that capacity, the position is inherently political). Consequently, unless necessary to discern a position's inherent duties, this court ordinarily does not look to the job as performed by the plaintiff. *Baker*, 167 F.3d at 1018.

A government position may be covered by the *Elrod/Branti* exception even though it does not correspond precisely to any one *McCloud* category. *Sowards*, 203 F.3d at 436. If it is unclear whether an unclassified[9] or non-merit government position belongs to a *McCloud* category, this

---

[9] Under Ohio law, "[a]n unclassified employee is appointed at the discretion of the appointing authority and serves at the pleasure of such authority." *State ex rel. Hunter v. Summit County Human Res. Comm'n*, 692 N.E.2d 185, 188 (Ohio 1999). As such, unclassified employees are at-will employees and have no vested property interest in continued employment. *Id*.

court is to construe the position as one that qualifies for the *Elrod/Branti* exception. *See McCloud*, 97 F.3d at 1557.

Garvey argues that, contrary to the conclusion of the district court, the Administrative Officer position meets neither the requirements of category two nor of category three. In this case, Franklin County recorder is clearly a category one position, as the position of county recorder is specifically named in state law and charged with recording and indexing various legal instruments. *See* Ohio Rev. Code § 317.08 (2002). It is also clear that the Administrative Officer works at the behest of the Franklin County recorder. Hence, this court must determine whether the duties inherent to the position and as envisioned by Montgomery make it such that the position falls within one of the *McCloud* categories.

Metcalf and Montgomery entrusted their Administrative Officer with broad authority to manage the central operations of the Recorder's Office. For instance, while serving under Metcalf, Garvey's job description as Administrative Officer was as follows:

> Responsible for an automated recording and imaging operation that provides archival and retrieval services for real estate related documents for both public and private research. Duties entail supervision of eight departments involving approximately thirty-five employees in a customer service oriented organization that generates $5,000,000 in revenue and archives 350,000 documents annually. Prepares draft correspondence and reports as required. Resolves personnel grievances and coordinates personnel assignments, awards and disciplinary actions with senior staff. Reviews personnel evaluation requirements and routine tasks associated with work schedules. Responsible for customer/public relations. Prepares and submits annual financial and activity report to senior staff.

When Montgomery became recorder, he added to the foregoing description the following preface:

> The Administrative Officer oversees the entire operation of the office staff excluding the Chief Deputy and the Recorder. The Administrative Officer is employed by the

> Recorder and has fiduciary and administrative relationship [sic] to the elected
> County Recorder. Some of the duties of the Administrative Officer are listed below
> but not limited [sic] to this non-exhaustive list.

Montgomery's description also clarified that the annual financial and activity report was to be submitted to the chief deputy and recorder. Under both Montgomery and Metcalf, the position has been unclassified.

Additional evidence indicates that inherent to the Administrative Officer position was considerable institutional authority over the primary functions of the Recorder's Office. An organizational chart from Metcalf's tenure as recorder indicates that, as Administrative Officer, Julie Garvey managed the following individuals and departments: assistant administrative/payroll-benefits officer; reception desk; accounting; cashier supervisor; general index supervisor; electronic data management supervisor; data entry/quality assurance; Uniform Commercial Code supervisor; retrieval supervisor; office specialist; and office assistants. An organizational chart describing Montgomery's administration shows that the Administrative Officer manages the following individuals and departments: receptionist; accounting; cashiering department; general index department; electronic data management department; retrieval department; Uniform Commercial Code department; and office specialists.

It is apparent that, in both administrations, the Administrative Officer possessed broadly defined managerial authority, which in itself suggests that it is subject to the *Elrod/Branti* exception. *Hoard*, 198 F.3d at 212. Additionally, inherent to the position is oversight over the core operations of the Recorder's Office – namely, the recording and indexing of statutorily specified legal instruments. Far from being a mere bureaucrat or ministerial official, then, the Administrative

Officer was (and is) expected to utilize managerial discretion to ensure that the Recorder's Office performed its archival and retrieving functions accurately and efficiently. As such, it is a position to which has been delegated a significant portion of the recorder's total discretionary authority in fulfilling his statutory duties of recording and indexing public documents. This places the position squarely within category two. *See McCloud*, 97 F.3d at 1557.

Montgomery's intentions for the post as the incoming recorder only strengthen this conclusion. Montgomery explained that, upon assuming office, he planned to rely heavily on the Administrative Officer and, thus, wanted the person who filled that position to be someone he could trust absolutely: "[O]ne of my philosophies has been in business . . . that I'm not a micro manager and I have to entrust a lot of faith and confidence in those people in those very high supervisory positions that I delegate a lot of authority and decision making on how the operations are run."

Consistent with his professed distaste for micro-management, Montgomery strengthened the hand of the Administrative Officer in his administration. For example, while the Administrative Officer had little input into hiring and firing during Metcalf's administration,[10] Montgomery granted the Administrative Officer a considerable role in hiring employees in certain departments of the Recorder's Office. The precise extent of this role is unclear. Raymer, who serves as Administrative Officer for Montgomery, testified that he hires employees in those departments over which he has oversight and that he has "the final say." But he also testified that he notifies Hennebert of whom

---

[10]There is some indication that, during the time that she managed the Recorder's Office in Nichter's absence when Montgomery maintained the status quo as interim recorder, Garvey did hire two employees. Considering the special nature of the circumstances, these hiring actions do not reflect upon the inherent duties of the Administrative Officer.

he wants to hire and that Hennebert "always went along with my recommendations," which suggests that the Chief of Staff, not the Administrative Officer, has the ultimate authority to make hiring decisions. Hennebert testified to the contrary, stating that Raymer does have hiring authority over his departments. A question of fact exists, then, with respect to whether the Administrative Officer in Montgomery's administration has absolute authority to hire employees or whether he offers advice on these matters to the Chief of Staff, who makes the ultimate decision. Nonetheless, even when viewing the evidence in the light most favorable to Garvey, it is apparent that, at the very least, Montgomery's Administrative Officer advises the Chief of Staff as to who should be hired in the departments the Administrative Officer manages and that this advice is generally followed, indicating that the Administrative Officer has substantial input into hiring decisions.[11]

Among other things, Garvey and defendants quibble over whether the Administrative Officer in either administration represented the recorder at meetings of various boards of which he was a statutory member, whether any such representation in Montgomery's administration was in response to the litigation, and the extent of the Administrative Officer's role in budgetary matters. However, the resolution of such questions is immaterial to the disposition of this case. The bottom line is that since the county recorder charged the Administrative Officer with managing the functions crucial to the fulfillment of the recorder's statutory duties, the recorder cannot be forced to retain in such

---

[11]Furthermore, to the extent that the Chief of Staff is a category two employee because he has ultimate authority to hire employees within the Recorder's Office, then the Administrative Officer position falls within category three because it involves advising a category two employee – the Chief of Staff – on how to exercise the authority to hire he has been delegated by the recorder, a category one employee. *McCloud*, 97 F.3d at 1557.

a position a person whose political affiliations are antagonistic to his own. Even if it were a close question as to whether the Administrative Officer – an unclassified position – is subject to the *Elrod/Branti* exception, this court would have to infer that it is. *See McCloud*, 97 F.3d at 1557 (stating that any ambiguity about whether a particular unclassified position is subject to the exception is to be construed in favor of the governmental defendants).

Consequently, even assuming Garvey was discharged on account of her political affiliation, her position was subject to the *Elrod/Branti* exception and is not subject to the protections of the First Amendment. She thus has no claim that her discharge involved a constitutional violation, and the district court properly granted defendants summary judgment on this claim.

## III.

For the foregoing reasons, the district court's grant of summary judgment to defendants is affirmed.