NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0087n.06

Case No. 15-1718

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

BETH BAUER,                                    )
                                               )
    Plaintiff-Appellant,                       )          ON APPEAL FROM THE
                                               )          UNITED STATES DISTRICT
v.                                             )          COURT FOR THE EASTERN
                                               )          DISTRICT OF MICHIGAN
SAGINAW COUNTY, et al.,                        )
                                               )
    Defendants-Appellees.                      )
                                               )          O P I N I O N

FILED
Feb 09, 2016
DEBORAH S. HUNT, Clerk

BEFORE: GUY, SUTTON, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Beth Bauer served as the Legal Office Manager for Saginaw County Prosecutor Michael Thomas for over twenty years—until John McColgan defeated Thomas in a heated primary campaign. Once elected Prosecutor, McColgan told Bauer he would be bringing in his own Legal Office Manager, and he offered Bauer another position in the Prosecutor's Office. When she refused, McColgan terminated Bauer's employment.

Bauer sued McColgan and Saginaw County (the defendants) for wrongful termination. The district court granted summary judgment to the defendants, and Bauer appeals. Her primary arguments are that her termination was a violation of her First Amendment right to political affiliation—i.e., that she was fired for her loyalty to Thomas—and that her termination also breached her employment agreement with the County. But because political affiliation is an

appropriate consideration for the Legal Office Manager position, the defendants did not violate Bauer's constitutional rights by terminating her. And because Bauer failed to exhaust a mandatory grievance procedure in her employment agreement, we do not reach the merits of her breach-of-contract claim. As Bauer has failed to show a dispute of fact in any of her remaining claims, we affirm the district court's grant of summary judgment to the defendants.

**I**

Beth Bauer was hired to be the Legal Office Manager for the Saginaw County Prosecutor on April 21, 1989, by incoming County Prosecutor Michael Thomas. Bauer's position required her to work closely with Thomas, supervise and train the office's support staff, and oversee the office's day-to-day operations. She took part in hiring decisions and administered the Prosecutor's Office budget, at least with respect to day-to-day office supplies, witness fees, and the like. She also signed the job description for the Legal Office Manager position, which she agrees "accurately reflects" the duties of the position.

As the Legal Office Manager, Bauer was represented by the UAW, Local No. 455, Unit 48, Managers (the Union), and the terms and conditions of her employment were covered by a collective bargaining agreement (CBA) negotiated by the Union. The 2004 CBA (or old CBA) provided that the Legal Office Manager could only be terminated for just cause. In 2008, however, Saginaw County proposed to change the position to be terminable at will. During negotiations, the parties reached a compromise: the 2008 CBA (or new CBA) would provide for at-will employment, but the Legal Office Manager would remain a just-cause position so long as Bauer held it. The parties included the following language in the 2008 CBA to reflect this compromise: "Legal Office Manager (at-will employee; see MOU)."

The term "MOU" in the CBA refers to the Memorandum of Understanding, which purports to maintain Bauer's position as a just-cause employee. It provides, in relevant part:

> Contingent on ratification of a new CBA, which shall designate in its Appendix that the position of Legal Office Manager in the Prosecuting Attorney's Office is an at-will position, the Employer, Co-Employer and Union agree that the incumbent in said position, Beth Bauer, is not an at-will employee, but rather an employee subject to discipline under a just cause standard.

R. 1-1, MOU, Page ID 23. The MOU also provided that it would "have no force or effect unless and until a new CBA [was] ratified." Then-Prosecutor Thomas, the County Controller, the County's legal counsel, and the Union's representatives signed the MOU on December 1, 2009. The new CBA was ratified on December 15, 2009, thereby giving effect to the MOU.

In 2012, Defendant John McColgan defeated Thomas in a primary for County Prosecutor that Bauer described as "very negative." McColgan was then elected unopposed in the general election and was set to take office in January 2013. While establishing his administrative team, he offered the Legal Office Manager position to Christi Lopez, who accepted and resigned from her previous job on November 29, 2012. On December 10, 2012, McColgan emailed Bauer to inform her that he was hiring someone else to be his Legal Office Manager: "As I am sure you are aware, I am planning on bringing in my own office manager, as I believe every prosecutor before me has done." R. 41-9, McColgan Email, Page ID 827.

Bauer and her Union representatives met with McColgan before he took office to discuss Bauer's employment. They apparently failed to resolve the situation, as Bauer arrived on McColgan's first day to find Lopez sitting at her desk. McColgan offered Bauer a job in the office as a "floater," but she refused and testified that McColgan did not have the authority to offer her that position. When Bauer asked whether she was fired, McColgan could not give her an answer. Bauer and her Union steward then contacted the Saginaw County Controller, who

came to the steward's office and presented Bauer a Notice of Discharge signed by McColgan. The Notice of Discharge stated "[s]ervices no longer needed. Are an at-will employee under state statute."

Both CBAs (old and new) include a mandatory grievance procedure, leading Bauer to file a grievance asserting that her termination violated the Memorandum of Understanding. While the grievance was pending, Bauer sued Saginaw County and McColgan (individually and in his official capacity) in district court, and the parties agreed to hold Bauer's grievance in abeyance pending the resolution of this litigation. The district court granted the defendants' motion for summary judgment on all claims, although it dismissed Bauer's contract claim without prejudice to allow her to exhaust the CBA's grievance procedure. Bauer timely appealed.

## II

We review a grant of summary judgment *de novo*. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a grant of summary judgment, we view the evidence and draw all reasonable inferences in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The inquiry is whether a reasonable jury could return a verdict for the nonmoving party or whether the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Bauer appeals the district court's decision to grant summary judgment on: (1) her 42 U.S.C. § 1983 claim alleging violation of her First Amendment right to political association; (2) her claim for breach of contract, arguing she was terminated as an at-will employee even

though the MOU provided for just-cause employment; (3) her claims for age and race discrimination; (4) her motion to strike certain exhibits from the defendants' motion for summary judgment; and (5) her claim for intentional infliction of emotional distress. We address each in turn.

## III

Bauer first appeals the district court's grant of summary judgment on her 42 U.S.C. § 1983 claim that she was terminated in violation of her First Amendment rights because of her loyalty to former Prosecutor Thomas. "Since the Supreme Court issued its opinion in *Elrod v. Burns*, 427 U.S. 347 (1976), patronage dismissals (*i.e.*, dismissals for failure to support a particular party or candidate) have been, in general, unconstitutional." *Caudill v. Hollan*, 431 F.3d 900, 908 (6th Cir. 2005). Patronage dismissals are typically prohibited because they violate a public employee's First Amendment right to political belief and association. *Elrod*, 427 U.S. at 356–57. However, the Supreme Court has carved out an exception, holding patronage dismissals to be acceptable in circumstances where political affiliation is a legitimate requirement for government employment. *Id.* at 366–68; *see McCloud v. Testa*, 97 F.3d 1536 (6th Cir. 1996). Unsurprisingly, the Legal Office Manager—a confidential employee who works closely with the Prosecutor and runs his office—fits well within this exception.

## A

The first step in a patronage dismissal claim requires the plaintiff to introduce sufficient evidence for a jury to find she was discharged because of her political beliefs or affiliation. *Branti v. Finkel*, 445 U.S. 507, 508 (1980). McColgan admits he terminated Bauer, at least in part, because she was employed by his predecessor (and political opponent) for over twenty years. That is sufficient to show a prima facie case for an unconstitutional patronage dismissal.

The burden then shifts to the defendants to establish that the position falls within the exception to the rule against patronage dismissals by showing "'that [political] affiliation is an appropriate requirement for the effective performance of the public office involved.'" *Lane v. City of LaFollette, Tenn.*, 490 F.3d 410, 418–19 (6th Cir. 2007) (quoting *Branti*, 445 U.S. at 518). Though we are not categorically bound in our analysis, we have identified four categories of positions that fall with reasonable certainty within the so-called "*Elrod-Branti* exception":

> Category One: positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;
>
> Category Two: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;
>
> Category Three: confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;
>
> Category Four: positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*McCloud*, 97 F.3d at 1557.

These are not hard-and-fast categories, but merely a guide in our evaluation of whether a position qualifies for the exception. Further, "if there is any ambiguity about whether a particular position falls into any [of the categories] (and so also within the *Branti* exception), it is to be construed in favor of the governmental defendants." *Id.* McColgan, as County Prosecutor,

falls within Category One. The defendants argue they did not violate Bauer's constitutional rights because the Legal Office Manager position falls within Categories Two and/or Three.

**B**

Category Two "is constructed to recognize that it may be necessary to deny First Amendment protection not just to positions at the very top of any state administrative hierarchy, but in some cases to those occupying levels a bit farther down the hierarchy." *Id.* at 1557 n.31. The hallmark of a Category Two position "is not high rank, but *political* discretion, even if exercised at a fairly low level." *Justice v. Pike Cty. Bd. of Educ.*, 348 F.3d 554, 561 (6th Cir. 2003). To determine whether a position involves political discretion, "we must examine the inherent duties of that position *and* the duties that the new holder of that position will perform." *Faughender v. City of N. Olmsted, Ohio*, 927 F.2d 909, 913 (6th Cir. 1991).

Our natural starting place is the job description for the Legal Office Manager. The Legal Office Manager's purpose is "[t]o manage the Saginaw County Prosecutor's Office. Ensure adequate support staff levels and coverage. Oversee day-to-day operations of support staff and operating functions of the office. Administer Prosecutor's budgets totaling $3.7 million and direct interstate extraditions and renditions." R. 42-3, Job Description, Page ID 1077. The duties listed in the job description reflect this purpose: the Legal Office Manager supervises nineteen employees and makes decisions to "[h]ire, fire and discipline and direct support staff work," to "[t]rain new employees," and to "[r]esolve staff conflicts." The Legal Office Manager reports directly to the Prosecutor and has "[a]lmost complete independent authority for daily management of support staff and budget functions." And while Bauer argues that the actual duties do not match the formal job description, she signed the description herself and agrees that it accurately reflects the position's duties.

Beyond the job duties, we also look to how the Legal Office Manager actually functions under McColgan. *See Faughender*, 927 F.3d at 913. McColgan sees the position as one with significant discretionary authority that includes hiring and firing employees, developing office policy, and handling the Prosecutor's Office budget. Lopez (Bauer's replacement) confirmed that she runs the day-to-day operations, largely controls the hiring and discipline process, and is heavily involved in the budgeting process with the authority to make unilateral changes to some aspects of the budget.

Based on this undisputed evidence, the Legal Office Manager has substantial discretionary authority. The Legal Office Manager's duties are also consistent with our Category Two classifications in prior cases. *See, e.g.*, *Peterson v. Dean*, 777 F.3d 334, 344–46 (6th Cir. 2015) (collecting cases).[1] The position's budgetary authority is particularly salient, as "'budgetary decisions are among the most significant, and the most political, actions which government officials take.'" *Id.* at 347 (quoting *Blair*, 76 F.3d at 100). Taking all of this into account, the Legal Office Manager fits the description for Category Two.

## C

Category Three was formulated to comport with the Supreme Court's indication in *Branti* that a Category One official—in *Branti*, a governor—may "'believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate

---

[1] Our case law provides many examples of administrative positions that fall within Category Two. We have held that a chief deputy county clerk, who ran the clerk's office on a day-to-day basis and implemented a cross-training program, was a Category Two position. *Summe v. Kenton Cty. Clerk's Office*, 604 F.3d 257, 268 (6th Cir. 2010). Similarly, a county trustee's business manager, who was responsible for facilitating the collection, accounting, and distribution of state and county taxes, supervising employees, controlling the office bank account, and making budgetary decisions, fell within Category Two. *Ray v. Davis*, 528 F. App'x 453, 459–60 (6th Cir. 2013). So did an administrative officer who possessed broad authority to manage the central operations of the county recorder's office. *Garvey v. Montgomery*, 128 F. App'x 453, 466 (6th Cir. 2005). And in *Blair v. Meade*, 76 F.3d 97, 101–02 (6th Cir. 1996), we held that an employee (as well as his assistant) who served as a purchasing agent, chief financial officer, and office manager with a supervisory role in administering the budget was a political position within the exception for patronage dismissals.

with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments.'" *McCloud*, 97 F.3d at 1557 n.32 (quoting *Branti*, 445 U.S. at 518). Thus, Category Three employees are "confidential advisors" who spend significant time advising Category One officials on how to exercise their statutory authority. *Summe*, 604 F.3d at 268. Category Three also includes employees "who control the lines of communications" to Category One officials. *Id.* (citing *McCloud*, 97 F.3d at 1557).

The Legal Office Manager advises McColgan, a Category One official, on policymaking decisions related to personnel, office policy, and budget administration. She is "privy to confidential communications related to budget, administration of [the Prosecutor's] office and certain prosecutorial and political functions." R. 42-5, McColgan Aff. at ¶ 7, Page ID 1106. She reports directly to the Prosecutor and serves as his "eyes and ears" in the office. And she "serves as [his] liaison to the courts, Sheriff's Department, local police agencies and elected officials and controls the lines of communications with these entities." In a sense, the Legal Office Manager serves as a gatekeeper to and for the County Prosecutor, and we have previously held that employees performing similar functions fall within Category Three. *See, e.g.*, *Smith v. Sushka*, 117 F.3d 965, 971 (6th Cir. 1997) (holding that administrative assistant to county engineer was a Category Three position). Accordingly, the Legal Office Manager fits the description for Category Three.

**D**

Putting the rather rigid categories from *McCloud* aside for a moment, the Legal Office Manager is better viewed as a position that includes elements of Category Two and Category Three. While Bauer contends that the position does not fit cleanly into either category, we do not require a perfect fit and need not force square pegs into round holes. *See  Sowards v. Loudon*

*Cty., Tenn.*, 203 F.3d 426, 436 (6th Cir. 2000) ("A government position is not required . . . to fall neatly within one of the categories to be entitled to the . . . exception."). Bauer's argument ignores the reality that state governments at all levels design positions with varying and evolving duties, and many of these positions require consideration of political affiliation—regardless of whether the position is a tidy fit in one of our pre-formulated categories. The categories were never intended to be rigid. *See, e.g.*, *Summe*, 604 F.3d at 268–69 (holding that chief deputy county clerk, who ran clerk's office on a day-to-day basis and served as a confidential employee, was both a Category Two *and* a Category Three position). Moreover, to the extent there is ambiguity as to whether the Legal Office Manager falls within Category Two, Category Three, or both, our precedent mandates that the defendants prevail. *See McCloud*, 97 F.3d at 1557.

We might best describe the Legal Office Manager as a "Category 2.5" employee. Even so, it is a position where political affiliation is a legitimate requirement for employment. As such, we hold that the Legal Office Manager falls within the exception to the rule against patronage dismissals and affirm the district court's decision to grant summary judgment to defendants on this claim.[2]

### IV

Bauer next appeals the grant of summary judgment on her contract claim, arguing that her termination as an at-will employee violates the just-cause provision in the Memorandum of Understanding (MOU). The defendants counter that Bauer was correctly characterized as an at-will employee because the MOU cannot trump the County Prosecutor's statutory authority, under Michigan law, to hire and fire his employees at-will. *See* Mich. Comp. Laws §§ 49.31, 49.35 (granting authority to county prosecutor to hire and fire employees at will). The district court did not address the merits of this claim, dismissing it without prejudice because Bauer

---

[2] Because no constitutional violation occurred, we need not address qualified immunity under 42 U.S.C. § 1983.

admittedly failed to exhaust the grievance procedure under the CBA. After carefully considering the CBA and the MOU, we agree with the district court.

Both CBAs (old and new) include a grievance procedure that employees must follow before filing suit. The grievance procedure, however, is limited to disputes arising under the CBA. The parties agree that Bauer's claim arises under the MOU, but disagree on whether Bauer needed to follow the CBA's mandatory grievance procedure. This disagreement hinges on whether the MOU is incorporated by reference into the CBA. If it is, Bauer was required to exhaust the CBA's grievance procedure before bringing her contract claim, and the district court properly dismissed her claim without prejudice. If the MOU is not incorporated, Bauer was not required to exhaust.

When interpreting a contract under Michigan law, we focus on the intent of the parties. *Forge v. Smith*, 580 N.W.2d 876, 881 & n.22 (Mich. 1998) (citing *Mich. Chandelier Co. v. Morse*, 297 N.W. 64, 67 (Mich. 1941)). We start with the language of the contract itself, and cannot look to extrinsic evidence "'when the words used by [the parties] are clear and unambiguous and have a definite meaning.'" *Wonderland Shopping Ctr. Venture Ltd. Partnership v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1095–96 (6th Cir. 2001) (quoting *Morse*, 297 N.W. at 67).

Under Michigan law, parties may incorporate terms or documents from other writings into a contract. *Robert Bosch Corp. v. ASC Inc.*, 195 F. App'x 503, 505 (6th Cir. 2006) (citing *Forge*, 580 N.W.2d at 881–82). "Where one writing references another instrument for additional contract terms, the two writings should be read together." *Forge*, 580 N.W.2d at 881. And if the reference is "'made for the purpose of making such writing a part of the contract, [it] is to be

taken as a part of it just as though its contents had been repeated in the contract.'" *Id.* at 881 n.21

(quoting *Whittlesey v. Herbrand Co.*, 187 N.W. 279, 280 (Mich. 1922)).

The old CBA provided for just-cause employment for the Legal Office Manager position.

However, the new CBA provides that elected officials' employees are at-will. The new CBA

lists these job positions within Saginaw County, including the Legal Office Manager, and

explicitly references the MOU: "Legal Office Manager (*at-will employee; see MOU*)." R. 41-4,

2008 CBA at 39, Page ID 787 (emphasis added). Following the CBA's clear direction to "see

MOU," the Memorandum of Understanding includes the following operative language:

1. *Contingent on ratification of a new CBA*, which shall designate in its Appendix that the position of Legal Office Manager in the Prosecuting Attorney's Office is an at-will position, the Employer, Co-Employer and Union shall agree that the incumbent in said position, Beth Bauer, is not an at-will employee, but rather an employee subject to discipline under a just cause standard.

2. Once the incumbent vacates the position, all subsequent employees holding the Legal Office Manager position in the Prosecuting Attorney's Office shall be at-will employees and not subject to discipline under a just cause standard, unless specifically negotiated otherwise in future CBAs.

3. This Memorandum of Understanding *shall have no force or effect unless and until a new CBA is ratified*, which designates in its Appendix that the position of Legal Office Manager in the Prosecuting Attorney's Office is an at-will position.

4. This Memorandum of Understanding *shall not affect any provision of the current or future CBA other than that which is specifically provided* herein.

R. 1-1, MOU, Page ID 23 (emphasis added).

The clear language of both documents shows the parties intended the CBA to incorporate

the MOU by reference. The CBA directs the reader to "see MOU." There is nothing fuzzy

about this language; "see MOU" means we must see (i.e., read) the MOU. And one look at the

MOU's numerous references to the CBA makes it obvious that "the two writings should be read together." *Forge*, 580 N.W.2d at 881. The MOU is contingent on the CBA for effect, and was not enforceable "unless and until" the new CBA was ratified.

The MOU, by its own terms, "shall not affect any provision of the current or future CBA other than that which is specifically provided herein." Thus, Bauer's terms of employment, including the mandatory grievance procedure, are governed by the new CBA and explicitly *not* affected by the MOU. The MOU—a document explicitly intended *only* to affect the new CBA's provision for at-will employment—cannot be read to do the exact opposite and also eliminate the CBA's mandatory grievance procedure.

Bauer's attempts to explain away the clear language of the CBA and MOU are unpersuasive. She notes that the MOU was signed two weeks before the CBA, arguing that her rights under the MOU vested before the CBA was signed and the CBA cannot alter her "vested" right to sue under the MOU. Unfortunately, this argument runs headlong into the language of the MOU itself, as the MOU could not have "vested" her rights before the CBA was enacted because *it was contingent on the CBA's enactment for legal effect*. Bauer also suggests that the CBA's direction to "see MOU" is ambiguous, but "see MOU" can only mean we are to read the MOU—just as anyone who was directed to "see page seven" of this opinion would know to go read page seven. Finally, Bauer offers extrinsic evidence that the MOU was not intended to be incorporated into the CBA, but we cannot consider it because the parties showed a clear intent for the documents to be read together. *See Morse*, 297 N.W. at 67.

Because the MOU is incorporated into the CBA, Bauer was required to exhaust the CBA's grievance procedure before bringing her contract claim. She has not yet done so, and therefore we affirm the district court's decision to dismiss her contract claim without prejudice.

**V**

Bauer's remaining claims lack substance and can be dealt with in quick succession.

*Age and Race Discrimination.* Bauer, who is Caucasian and was forty-nine years old when she was terminated, claims she was discriminated against in favor of Lopez, who is Hispanic and was (according to the defendants) forty years old.

Under the *McDonnell Douglas* test, once the plaintiff establishes a prima facie case for discrimination, the burden shifts to the defendants to articulate a legitimate, non-discriminatory reason for the employment decision. *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010); *Lytle v. Malady*, 579 N.W.2d 906, 915 (Mich. 1998). If the defendants meet this burden, the plaintiff must show the employer's explanation was merely a pretext for intentional discrimination. *Id.*

The defendants concede Bauer established a prima facie case, but McColgan articulated several legitimate reasons for firing Bauer: (1) she was employed by the previous County Prosecutor for over twenty years; (2) it was reported that she made comments indicating she "could not" and "would not" work for McColgan; and (3) it was reported that she showed "favoritism" within the office. As such, Bauer must show that these explanations were a mere pretext for age or race discrimination.

She failed to do so, providing no evidence that McColgan's reasons for her termination were a pretext *for discrimination*. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."). Given the utter absence of anything in the record that could suggest age or race played a role in Bauer's termination, we affirm summary judgment in favor of the defendants on these claims.

*Motion to Strike.* Bauer briefly argues that the district court erred in denying as moot her motion to strike certain exhibits from the defendants' motion for summary judgment. The exhibits in question are purportedly related to the merits of Bauer's contract claim. Because we do not address the merits of that claim, the motion is moot and we affirm.

*Intentional Infliction of Emotional Distress.* Bauer's final argument is that McColgan is not entitled to absolute immunity from her state law claim for intentional infliction of emotional distress. Under Michigan law, the highest elected executive official at every level of government is "immune from tort liability for injuries to persons . . . if he or she is acting within the scope of his or her judicial, legislative, or executive authority." MCL § 691.1407(5). McColgan is the County's highest elected official, and is absolutely immune so long as he was acting within the scope of his executive authority when he terminated Bauer.

"Executive authority" within § 691.1407(5) means "all authority vested in the highest executive official by virtue of his or her position in the executive branch." *Petipren v. Jaskowski*, 833 N.W.2d 247, 257 (Mich. 2013). The County Prosecutor has the authority to appoint "assistant prosecuting attorneys," "investigating officers, clerks, stenographers and other clerical employees." MCL § 49.31. These employees serve at the pleasure of the Prosecutor. MCL § 49.35. It would make no sense for McColgan to be authorized to appoint (§ 49.31) and terminate (§ 49.35) assistant prosecutors, investigators, clerks, stenographers, and other clerical employees—basically everyone in the Prosecutor's Office—while lacking the authority to hire and fire the Legal Office Manager. As such, McColgan was acting within his executive authority when he terminated Bauer and is entitled to absolute immunity.[3]

---

[3] Even if McColgan was not entitled to absolute immunity, Bauer presented no evidence that McColgan's decision was "extreme" or "outrageous," and therefore she has no basis for her claim for intentional infliction of emotional distress. *See Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 909 (Mich. 1985).

**VI**

For these reasons, we affirm the district court's decision to dismiss Bauer's contract claim without prejudice so that she may exhaust the CBA's mandatory grievance procedure and to grant summary judgment to the defendants on her remaining claims.