**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 05a0773n.06**
**Filed: September 1, 2005**

**No. 04-6162**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DERRELL E. CAGLE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| RICKY HEADLEY, | ) | MIDDLE DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee. | ) | |

Before: ROGERS and SUTTON, Circuit Judges; FORESTER, District Judge.[*]

SUTTON, Circuit Judge. When Ricky Headley, the newly elected sheriff of Williamson County, demoted Derrell Cagle from his position as a lieutenant in the sheriff's department, Cagle brought this lawsuit alleging that Headley had violated his free-speech rights under the First (and Fourteenth) Amendment as construed in *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980). The district court rejected Cagle's claim as a matter of law, holding that the lieutenant position falls within the "policymaking" exception to this type of claim. We affirm.

---

[*]The Honorable Karl S. Forester, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

I.

In 1982, Derrell Cagle joined the Williamson County sheriff's department as a deputy sheriff. Six years later, in 1988, Ricky Headley left his position as a patrol officer with the Alabaster, Alabama, police department and moved to Franklin, Tennessee, to accept a position as a Williamson County sheriff's deputy. Headley worked for the sheriff's department until 1994, rising to the position of a detective sergeant in the Criminal Investigations Division. That year, Headley actively supported the campaign of the incumbent sheriff, Lance Saylor, against his challenger, William LeCates, in the Republican primary, while Cagle supported LeCates. LeCates won. After taking office, LeCates eliminated the position of detective sergeant in the Criminal Investigations Division and fired Headley.

Headley's first recourse was federal court. On September 22, 1994, Headley sued LeCates, alleging that the discharge impermissibly stemmed from his support of Saylor in the 1994 election. *See Headley v. LeCates*, No. 3-94-0841 (M.D. Tenn. filed Sept. 22, 1994). In that lawsuit, Cagle testified as a witness against Headley, criticizing his competence as a law enforcement officer and his work as a detective. The case ultimately settled. Cagle in the meantime fared considerably better than Headley following LeCates's electoral success, receiving an immediate promotion to lieutenant—a title that, in the organizational structure of the department at the time, was the second-highest-ranking position after sheriff.

Headley's next recourse was the electorate. In 2002, Headley ran for Sheriff against LeCates. Cagle again supported LeCates in the election, despite Headley's suggestions that he faced the loss of his position at the sheriff's department if Headley should win. Headley won the Republican primary election in May of that year and ran unopposed in the August general election.

Proving that history involves as much continuity as it does change, one of Headley's first acts as the newly elected sheriff was to move Cagle from his position as a lieutenant to the position of deputy sheriff, a demotion that lowered his salary by approximately $5,000 a year. In explaining the demotion, Headley apparently told Cagle that "if you had stayed out of the election like I asked you . . . we wouldn't be having this conversation today." JA 239. Notwithstanding his decision to demote Cagle, Headley chose to retain, without demotion, two other lieutenants who had supported LeCates during the election. At the same time, he also created a new position, the chief deputy, to serve as the second most senior officer in the department.

In a further replay of the events that had occurred eight years earlier, Cagle filed this § 1983 action on November 25, 2002, alleging that Headley had violated Cagle's First and Fourteenth Amendment rights by dismissing him on the basis of political patronage and that Headley had wrongfully discharged him under Tennessee law. After briefing by both parties, Headley submitted a statement of undisputed facts to establish that lieutenants in the Williamson County sheriff's department occupied a policymaking position such that the sheriff could properly take into account their political allegiance in making employment decisions. In arguing to the contrary, Cagle relied

on several affidavits submitted by former officers. On August 19, 2004, the district court granted summary judgment to Headley and dismissed the First Amendment action.

II.

In the setting of this qualified-immunity action, we ask two questions: (1) whether "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right" and (2) "whether the right was clearly established . . . in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see Lyons v. City of Xenia*, No. 03-3282, 2005 U.S. App. LEXIS 16034, at *9–12 (6th Cir. Aug. 4, 2005).

At the same time that the Court has held that "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), it has held that this protection does not extend to public employees who occupy "policymaking" positions in the government, *id.* at 367; *see also Rutan v. Republican Party*, 497 U.S. 62 (1990) (extending *Elrod*'s reasoning to promotions and demotions). Where the effective performance of a particular office demands affiliation with a particular party or subscription to a particular policy, the Constitution permits dismissal based on political grounds. *See Branti v. Finkel*, 445 U.S. 507, 518 (1980). A state governor, for example, may fairly "believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." *Id.*; *see also Rose v. Stephens*, 291 F.3d 917, 921 (6th Cir. 2002)

(recognizing the government's interest in securing employees who will "loyally implement the policies of its democratically elected officials").

"[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether . . . party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. Employees with "responsibilities that are not well defined or [that] are of broad scope" and employees who "act[] as an adviser or formulate[] plans for the implementation of broad goals" are more likely to be classified as policymakers. *Elrod*, 427 U.S. at 367–68; *see also id.* at 367 ("While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position. The nature of the responsibilities is critical."); *Latham v. Office of the Attorney Gen. of Ohio*, 395 F.3d 261, 269 (6th Cir. 2005) ("[W]here . . . the employee exercises significant authority on behalf of a policymaker (even with close supervision), where the employee is responsible for making important policy implementation recommendations to a policymaker, and where the inherent duties of the employee are broad and limited primarily by the discretion of the policymaker, it is likely that the employee is herself a confidential or policymaking employee under *Elrod*.").

To ascertain whether government employees fall within the policymaking exception, we look to state and local law to analyze the nature of the public office. *See Sowards v. Loudon County*, 203 F.3d 426, 439 (6th Cir. 2000) ("Because the duties of a jailer may vary from state to state, it is important to examine the applicable state and local law when deciding whether political

considerations may be used in employment decisions concerning a jailer."); *Williams v. City of River Rouge*, 909 F.2d 151, 154 (6th Cir. 1990) ("[T]he relevant focus of analysis is the inherent duties of the position in question, not the work actually performed by the person who happens to occupy the office."). In making this assessment, we "look beyond the mere job title and examine the actual duties of the specific position," *Hall v. Tollett*, 128 F.3d 418, 423 (6th Cir. 1997), and examine the inherent duties of the position envisioned for the new holder of the office, *see Faughender v. City of North Olmsted*, 927 F.2d 909, 913 (6th Cir. 1991), as well as the person holding the position at the time of the alleged violation, *see Williams*, 909 F.2d at 154. Whether a particular government employee is in a policymaking position depends on whether he falls within one of the following categories, the third of which is at stake in this appeal:

> 1. [P]ositions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;
>
> 2. [P]ositions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;
>
> 3. [C]onfidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors; [and]
>
> 4. [P]ositions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996). "If an employee's position falls within one of these categories, then that person's position falls within the *Branti* exception allowing for patronage dismissals." *Heggen v. Lee*, 284 F.3d 675, 682 (6th Cir. 2002) (citing *Hall*, 128 F.3d at 424).

In applying these precedents, we have held that a deputy sheriff *does not* fall within the policymaking exception where "the position of deputy sheriff was at the bottom of the chain of command in the [department]," the primary duty of the deputy sheriff was "to patrol the roads of the county" and the record did not indicate that the deputy had "the amount of discretion or policymaking authority[] that would make political affiliation an appropriate requirement for employment." *Hall*, 128 F.3d at 429; *see Heggen*, 284 F.3d at 684 (noting that serving civil and arrest warrants, transporting prisoners and providing courtroom security did not make a deputy sheriff a policymaker); *Sowards*, 203 F.3d at 438 (jailer was not a policymaker where his duties included "providing for the needs and safety of the jail's inmates, such as providing food, bedding, and support for the inmates, taking precautions to ensure their safety, and arranging communications between inmates and the public").

By contrast, we have held that the position of a chief deputy *does* qualify as a policymaking position where the employee "assumed the sheriff's duties in the sheriff's absence, supervised the deputies, scheduled their shifts, and recommended employees for dismissal to the sheriff." *Hall*, 128 F.3d at 425, 426 & n.4. A sheriff, no less than a governor, is "entitled to select a person whom he

kn[ows] to share his political beliefs to occupy a position with such high levels of discretion and policymaking authority." *Id.* at 426.

So far as the Williamson County sheriff's department is concerned and so far as the undisputed facts in this case show, lieutenants appear to fall on the policymaking side of the divide. Our inquiry, as a matter of precedent, would have been a short one if the Williamson County sheriff's department had retained the same organizational structure that it previously had under Sheriff LeCates. Prior to Headley's reinstitution of the chief deputy position, the lieutenants and one captain (who held and continues to hold a comparable rank to the lieutenants) were the Sheriff's primary advisors, implementers of policy and managers of the numerous deputy sheriffs. The lieutenants served as members of the sheriff's designated "command staff," each operating one of the department's divisions. JA 75. As the commanders of the divisions, the lieutenants implemented directives from the sheriff, managed their respective divisions, submitted annual budget requests and formulated policies and set goals to address their divisions' responsibilities, functions and problems. The lieutenants also advised the sheriff on policy and personnel matters, including employment decisions involving promotion, demotion, termination and hiring. Among their personnel responsibilities, the lieutenants (1) determined when a subordinate had committed a policy infraction or engaged in misconduct, (2) conducted periodic work load assessments to ensure that divisions were adequately staffed and (3) possessed authority to employ all discipline measures short of an unpaid suspension without the sheriff's consent in the case of an emergency. Each of the lieutenants also had authority to assume command of the department in the absence of

the sheriff, a duty with which Cagle is familiar as he himself acted as sheriff on several occasions during LeCates's tenure. The lieutenants, in short, were collectively the sheriff's second-in-command, with duties quite comparable to those that we held made a sheriff's department employee a policymaker in *Hall*. *See* 128 F.3d at 425, 429 (holding that "political affiliation [was] an appropriate requirement for employment" when sheriff's department employee "assumed the sheriff's duties in the sheriff's absence, supervised the deputies, scheduled their shifts, and recommended employees for dismissal to the sheriff").

The one wrinkle is this: When Headley created the chief deputy position, made the position second-in-command to the sheriff and transformed the lieutenants into serving as advisors and managers to the sheriff *and* the chief deputy, did that change matters? In our view, it did not. Cagle does not dispute that lieutenants in the slightly reorganized department retain essentially the same powers that they had under LeCates, the only change being the addition of a new layer (the chief deputy) between them and the sheriff. And Headley has, in some respects, increased the confidential aspects of the lieutenant's jobs, meeting with them once a week to discuss long-range issues that confront the department, discussions that are at times confidential. The weekly and often confidential meetings, the authority to discipline other employees and the managerial power over divisions all suffice to establish that the lieutenants wield enough authority to make "political affiliation an appropriate requirement for employment." *Id.*

In attempting to counter this conclusion and in attempting to show that *Hall* should not control this case, Cagle highlights those parts of the lieutenant's job description that by themselves

would not qualify for the *Branti* policymaking exception: serving criminal and civil process, providing court security, transporting prisoners, picking up the department mail from the post office, sorting and distributing the mail within the department and affixing postage to jury summonses. He highlights as well the limitations of the lieutenants' job description—that they cannot hire or fire employees without the specific approval of the sheriff, that they may make substantial policy changes only with the approval of the sheriff or the chief deputy and that they must "pursue the goals and objectives set by Sheriff Headley and [the chief deputy] without question and without deviation." JA 122. And he highlights the fact that Headley has not made ideological affiliation a requirement for the lieutenants he has employed, as suggested by the fact that the current chief deputy and other lieutenants supported Headley's opponent in the 2002 campaign.

That lieutenants must handle pedestrian tasks as well as substantial ones and that they must "pursue the goals and objectives" of the sheriff does not prevent their position from being a policymaking one. In every governmental bureaucracy, individuals who are not elected and not in charge are tasked with some ministerial jobs. The Treasury Secretary of the United States, to use one example, must "pursue the goals and objectives set by" the President and may on occasion perform tasks that do not involve the exercise of discretion and authority. Yet neither reality establishes that a newly elected President must retain his predecessor's Treasury Secretary. Nor does the fact that Presidents often select members of the opposing party to fill important positions in their cabinets establish that the President must eschew reliance on party loyalty when filling *all* cabinet positions. So it is the case here: Headley's willingness to hire a chief deputy and two

lieutenants who supported his opponent in the Republican primary does not turn these jobs into non-policymaking positions. The salient point is that the duties of Williamson County lieutenants combine discretionary and ministerial duties that are functionally more similar to the duties of the chief deputy in *Hall* than to the deputies in *Heggen*. *See also McCloud*, 97 F.3d at 1557 (employees qualify as "confidential advisors [if they] spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority").

In view of the fact-bound nature of this constitutional determination, the summary-judgment stage of this litigation and the dispute between the parties over the relevance of certain witnesses' deposition testimony vis-a-vis affidavits supplied by those same witnesses to the district court, we proceed to note that Cagle at any rate has not shown the violation of a clearly established right. *See Hernandez v. O'Malley*, 98 F.3d 293, 297 (7th Cir. 1996) ("Drawing a stable line in *Elrod* cases has been difficult; even slight differences in the nature and context of the job can lead to opposite outcomes. . . . Contextual balancing tests should be worked out prospectively, rather than at the expense of public officials who guess wrong about future legal developments."). Qualified immunity, the Supreme Court recently reaffirmed, is appropriate in money-damages suits against government employees, unless either a precedent "squarely governs" the outcome of the case or the case is so "obvious" that "general tests . . . 'clearly establish' the answer, even without a body of relevant case law." *Brosseau v. Haugen*, 125 S. Ct. 596, 599–600 (2004).

No case "squarely governs" the outcome here. Although the generalized right to be free of a patronage demotion was clearly established at the time of Headley's actions, the qualified-immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* As our discussion of the Williamson County lieutenants' duties fairly indicates, the position at best falls on the "hazy border" between *Hall* and *Heggen*. *Id.* at 600. Although Cagle need not identify "a separate patronage dismissal decision by the Supreme Court or the Sixth Circuit involving a particular position before qualified immunity can be denied," *McCloud*, 97 F.3d at 1556, he has failed here to identify a case from the Supreme Court or the Sixth Circuit that treats as nonpolicymaking a position that is similar for constitutional purposes to a lieutenant's position with these particular responsibilities. Indeed, there is considerable disagreement among the federal courts of appeals as to whether a *deputy sheriff*—a position that in most sheriffs' departments involves fewer responsibilities than a Williamson County lieutenant—falls on the policymaking side of the First Amendment divide. *Compare Jenkins v. Medford*, 119 F.3d 1156, 1164 (4th Cir. 1997) (en banc) (holding that "North Carolina deputy sheriffs may be lawfully terminated for political reasons"), *Upton v. Thompson*, 930 F.2d 1209, 1210 (7th Cir. 1991) (concluding that "political considerations are appropriate for determining qualifications for the position of deputy sheriff"), *and Terry v. Cook*, 866 F.2d 373 (11th Cir. 1989) (same), *with Burns v. County of Cambria*, 971 F.2d 1015, 1022 (3d Cir. 1992) (declining to hold "as a matter of law that party affiliation would further" the performance of deputy sheriffs); *cf. Cagle v. Gilley*, 957 F.2d 1347 (6th Cir. 1992). This division of opinion, as the Supreme Court has explained in a related context, by itself indicates that the "cases taken together undoubtedly show

that this area is one in which the result depends very much on the facts of each case." *Brosseau*, 125

S. Ct. at 600.

Neither can we say that Cagle's right to be free of a patronage dismissal was so "obvious"

as to be clearly established by a "general test[] . . . even without a body of relevant case law."

*Brosseau*, 125 S. Ct. at 599; *see also Lyons*, 2005 U.S. App. LEXIS 16034, at *33–34 . He thus also

cannot prevail under this option for showing the existence of a clearly established right.

III.

For these reasons, we affirm.