*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0128p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

ALINE SUMME,

*Plaintiff-Appellant,*

*v.*

No. 09-5794

KENTON COUNTY CLERK'S OFFICE; RODNEY
ELDRIDGE, Individually as Kenton County
Clerk; KENTON COUNTY, KENTUCKY,

*Defendants- Appellees.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 07-00068—William O. Bertelsman, District Judge.

Argued: March 4, 2010

Decided and Filed: May 10, 2010

Before: CLAY and McKEAGUE, Circuit Judges; POLSTER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Gail M. Langendorf, BUSALD FUNK ZEVELY, P.S.C., Florence, Kentucky, for Appellant. Beverly R. Storm, ARNZEN, MOLLOY & STORM, P.S.C., Covington, Kentucky, Stacy Marie Hege, LAW OFFICE, Covington, Kentucky, for Appellees. **ON BRIEF:** Gail Marie Langendorf, BUSALD FUNK ZEVELY, P.S.C., Florence, Kentucky, for Appellant. Beverly R. Storm, ARNZEN, MOLLOY & STORM, P.S.C., Covington, Kentucky, Stacy Marie Hege, LAW OFFICE, Covington, Kentucky, for Appellees.

_____

[*]The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————

## OPINION

———————————

DAN AARON POLSTER, District Judge.  In November 2006, Rodney Eldridge defeated Aline Summe, then-Chief Deputy County Clerk, in a campaign for the position of County Clerk in Kenton County, Kentucky.  Shortly thereafter, Eldridge sent a letter to all County Clerk's office employees directing them to submit applications for rehire. In December 2006, Eldridge sent letters to Summe and seven deputy clerks who supported her campaign, notifying them that he was discontinuing their employment beginning January 1, 2007.  Summe subsequently commenced this action in the Eastern District of Kentucky, alleging a claim against Eldridge for unlawful patronage dismissal in violation of the First Amendment, a claim against Kenton County for violating her constitutional privacy rights by disseminating certain personnel records during the campaign, and various state law claims against both Defendants.[1]  The district court issued an opinion and order granting summary judgment to Defendants on all federal claims, and declining to exercise pendent jurisdiction over the state law claims.  Summe appeals the district court's rulings dismissing with prejudice the federal claims.  For the reasons to follow, we **AFFIRM**.

## I.     FACTUAL BACKGROUND

Summe was employed as the Director of the Kenton County Animal Shelter from its inception in 1985.  In August 2003, the Kenton County Fiscal Court referred all the Animal Shelter employees, including Summe, to St. Elizabeth Hospital's Employee Assistance Program ("EAP") in an effort to address office conflict and employee morale. As part of the intervention, EAP Director Tina Rich met individually with the employees

———————————

[1]Six of the seven co-workers who were discharged filed a companion case against Eldridge and the County for unlawful patronage dismissal in violation of the First Amendment.  *Lois Davis, et al. v. Kenton County Clerk's Office, et al.*, No. 2:07-cv-00067-WOB (E.D. Ky.) (Eldridge later re-employed the one co-worker who did not join the suit.) Discovery in the companion case and Summe's case was conducted simultaneously, and the same deposition transcripts and exhibits were used to support and oppose summary judgment motions filed in both cases.  Eldridge filed a motion for summary judgment regarding the claims of two of the six plaintiffs.  The district court denied that motion and, on the eve of trial, the parties settled the case.

and issued a report on August 13, 2003 to the Fiscal Court's Deputy Judge Executive, Scott Kimmich ("the EAP report"). The report was highly critical of Summe's management and leadership skills. Rich made specific recommendations and formulated an action plan, with particular emphasis on management skills training, to help remedy the personnel problems. Rich admitted, however, that a tremendous amount of damage had already been done, and questioned whether the parties could set aside their differences and repair their working relationships. Upon reviewing the EAP report, Kimmich sent a memorandum to Summe advising her of the report's conclusions, informing her of the action plan, and requiring her to cooperate with the plan as an alternative to termination as Animal Shelter Director ("the Kimmich letter"). Summe denied that the report accurately portrayed the working environment at the Shelter and believed that Rich was biased against her. Thus, she refused to continue meeting with Rich after a few sessions, and asked to meet with someone at St. Elizabeth's other than Rich. As a result, Summe was fired. Summe appealed her termination, and the parties entered into a settlement agreement permitting her to resign.

On December 16, 2003, the Kenton County Fiscal Court received an open records request from a citizen named Randy Skaggs, who was associated with a no-kill sanctuary for dogs and cats. Mr. Skaggs requested all documents relating to Summe's removal as the director of the Animal Shelter. The records custodian denied the request on the basis that the records were personal in nature and would unlawfully invade Summe's privacy. Skaggs appealed the ruling to the Kentucky Attorney General who found that the Fiscal Court had violated the Open Records Act when denying Skaggs' request. The records, however, were never released to Mr. Skaggs.

In March 2004, then-County Clerk William Aylor invited Summe to work for him as a deputy clerk on a part-time basis. The County Clerk's office is headquartered in Covington, with a second office located in Independence. Summe worked in every department in both offices until she was promoted to supervisor of the Independence office. As supervisor, Summe oversaw the work of her subordinates, discussed and resolved issues involving their schedules, vacation time, lunch hours and break time, and

responded to customers' questions and complaints. Summe moved subordinates to different locations within the Independence office, but could not hire or fire people without Aylor's authorization.

While Summe was supervising the Independence office, the idea of cross-training began to germinate. Summe explains:

> I realized at the first Christmas party that half the people didn't even know each other and they had been there over 20 years, some of them. And I was just surprised that, you know, more of them didn't do more things. Because one of the things about floating from office to office, and from department to department, I could see where there were some shortages of help in some of the departments, and places where there were people that didn't have enough to do in other departments.
>
> And so just talking to fellow employees and different supervisors, we talked about cross-training, and I got the feeling that people wanted to be more helpful and do more things because some of them were bored with their jobs. So that's how the idea got started.

(R. 31 at 34-35.) Summe explained that cross-training employees would make the Clerk's offices run more efficiently and improve customer satisfaction:

> If you went to Covington and you had to file a lien and you had to buy a registration, you had three different offices you had to go to. And it was hard for me not to want to do everything for you because I knew how to do it. We had done it in Independence that way. And we were trying to get it so that people weren't frustrated with the fact that they had to now get out of line and go to another office and get a lien, and then go here and get a registration, and then they could finally come back to me and get the title transferred. So it was more to do with making it a more efficient setup than the way it was being run.

(Id. at 50.) Summe further observed that the deputy clerks would be able to cover their co-workers' duties when shorthanded.

On May 11, 2006, Aylor appointed Summe to the position of Chief Deputy County Clerk (or "Chief Deputy"), the primary purpose of which was to organize and implement the cross-training program. Aylor sent a memo to all Kenton County deputy clerks announcing the appointment:

> I have appointed Aline Summe to the position of Chief Deputy Clerk. In this position she will be handling all personnel issues in both the Independence and Covington office[s]. She will be scheduling an individual meeting with each deputy clerk and would like to have the attached form completed and returned before the meetings. Meetings will begin May 18th.

(R. 49, Ex. 1.) Summe had the clerks fill out forms stating what jobs they had performed, whether they had worked in departments other than the ones in which they were presently working, and if they were willing to work in both the Covington and Independence offices if needed. She then planned to meet with the supervisors and clerks individually to discuss their duties and the program. Summe had business cards made for herself that she put on counters in both offices so that if customers complained about the service, they would be referred to Summe who could explain the cross-training program and the expectation of more efficient service in the future. As Chief Deputy, Summe could make recommendations to Aylor about hiring and firing and transferring employees, but Aylor had the final say on such decisions. This appears to be the general consensus of the clerks, who testified that, other than the cross-training program and business cards, they had little contact with Summe, took up employment issues directly with their own supervisors, and contacted Summe before speaking directly to Mr. Aylor.

Although Summe was appointed Chief Deputy, she retained her duties as supervisor of the Independence office where she worked one or two days a week. She spent the rest of the week in Covington, where she ran the cross-training program and covered for deputy clerks on their lunch hours. A deputy clerk named Linda Trenkamp ran the Independence office in Summe's absence, but she was not promoted to supervisor and consulted Summe daily about matters arising in that office.

Some time after Summe was promoted to Chief Deputy, Aylor announced that he was not running for re-election. Summe decided to run for his position as the Democratic candidate against Rodney Eldridge, the Republican candidate. Eldridge was a paralegal who frequented the County Clerk's office over many years to perform tasks related to his work at a law firm.

On October 24, 2006, just prior to the election, David Sizemore, a dog breeder with whom Summe had conflicts at the Animal Shelter, made an open records request to Kenton County Records Custodian Joe Shriver for records relating to a reprimand Summe received in 1995, the paperwork relating to her resignation from the Shelter in 2003, and any other derogatory evaluations or reprimands she had received while working for the County. Three days later, he made a second open records request seeking all documents relating to the EAP report, investigation and action plan. Shriver released 13 pages of records, including the EAP report and the Kimmich letter, to Sizemore who apparently wasted no time sharing those records with the local media and others. A copy of the EAP report was left in the mailbox of one of the deputy clerks who supported Summe's campaign, with a note stating "something to read when you are out of a job January 1, 2007." (R. 56-11.) Eldridge claims he did not see the records until they appeared, unsolicited, at his house. On October 28, 2006, one day after the records were released to Sizemore, a local newspaper ran an article that discussed, and quoted from, the released records. The article included Eldridge's comment that "the disclosure shows he is the better candidate to lead the clerk's office, which oversees property and legal records, licenses motor vehicles and administers elections." (R. 56-9.)

In November 2006, Eldridge won the election, after which the Director of the Kentucky Association of Counties sent him a letter warning him about unlawful patronage dismissals. After receiving the letter and without consulting anyone, Eldridge sent letters to all deputy clerks directing them to reapply for their positions. In December 2006, again without consulting anyone, Eldridge sent letters to Summe and six clerks who supported her campaign, terminating their positions beginning January 1, 2007. He did not interview any of the terminated employees prior to firing them. Although downsizing the County Clerk's office was one of Eldridge's campaign priorities, he replaced the seven terminated employees with thirteen campaign contributors and supporters, many of whom did not file applications or submitted them after he had already offered them jobs. And while Eldridge retained a number of

employees who supported Summe, he demoted or transferred two of them and promoted three employees who supported him.

Before entering office, Eldridge determined the salaries of all employees in the County Clerk's office. The evidence shows that he gave considerably higher salaries to new hires than incumbent employees, and he gave considerable raises to incumbent employees who supported him and modest raises to those who did not. At deposition, Eldridge was unable to explain the disparities.

Eldridge testified that he decided to fire the seven women not because of the content of their applications, but based on his personal observations of them and brief exchanges he had with certain of their co-workers while he was conducting business at the County Clerk's office. Eldridge repeatedly claimed that the fired employees had attitude problems, were rude or disrespectful or had attendance problems, throwing in an occasional example. He testified that this conduct did not align with his vision of upgrading customer service.

Eldridge testified that Summe applied for the position of Chief Deputy, but that he chose not to fill the position immediately. In March 2007, Eldridge promoted a campaign supporter named Danny Miles, whom he initially hired on a part-time basis, to the position of Chief Deputy. Eldridge testified that he wanted someone for the position who would be a confidential advisor and help him run the office and elections, handle personnel and staffing issues, and run the office in his absence. Eldridge explained that he fired Summe because he did not like her management style.

## II.     PROCEDURAL BACKGROUND

On March 28, 2007, Summe commenced this action asserting a claim against Eldridge in his individual and official capacities for unlawful patronage dismissal in violation of the First Amendment, a claim against Kenton County for violating her constitutional privacy rights by disseminating her alleged medical records during her campaign, and various state law claims against both Defendants.

Eldridge initially filed a motion to dismiss the First Amendment claim against him on the ground that Summe's position fell within one of the exceptions to the rule against unconstitutional patronage dismissals.  The district court overruled the motion in order to permit Summe to conduct discovery on this question.[2]  Upon completion of discovery, Eldridge and the County filed summary judgment motions, seeking dismissal of the entire case.  The district court granted summary judgment in their favor on the federal claims, and dismissed the state law claims without prejudice.  Summe timely appealed the district court's rulings on the constitutional claims.

## III.     ANALYSIS

### A.     Standard of Review

The Sixth Circuit reviews *de novo* the district court's order granting summary judgment to the defendants.  *Edgar v. City of Collierville*, 160 Fed. Appx. 440 (6th Cir. Dec. 14. 2005) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999)).

### B.     Patronage Dismissal Claim Against Eldridge

Summe alleges a claim against Eldridge, in his individual and official capacities, for violating her First Amendment rights when he terminated her employment. Summe's First Amendment claim arises under 42 U.S.C. § 1983.  In order to establish a violation of § 1983, Summe must show that Eldridge deprived her of a constitutional right while acting under color of state law.  *Lane v. City of Lafollette, Tenn.*, 490 F.3d 410, 418 (6th Cir. 2007) (citation omitted).

In *Elrod v. Burns*, 427 U.S. 347 (1976), the Supreme Court held that patronage dismissals (i.e., dismissals for failure to support a particular candidate or party) violate the First Amendment.  In *Branti v. Finkel*, 445 U.S. 507, 517 (1980), the Supreme Court recognized that, although patronage dismissals are generally unconstitutional, "party affiliation may be an acceptable requirement for some types of government

---

[2]As noted *supra*, at 2 n. 1, this case and the companion case were managed and discovery was conducted, as if they were one case.  The same deposition transcripts and exhibits were used by the parties in this, and the companion, case in support of, and opposition to, summary judgment motions filed below.

employment." *Id*. "While these positions have been referred to as 'policymaking' or 'confidential,' whether those labels appropriately fit the position under consideration is not the ultimate inquiry." *Lane*, 490 F.3d at 419 (citing *Branti*, 445 U.S. at 518). The ultimate inquiry is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id*. To determine whether political afilliation is appropriate in making a personnel decision, "we must examine the inherent duties of that position and the duties that the new holder of that position will perform." *Baker v. Hadley*, 167 F.3d 1014, 1018 (6th Cir. 1999) (quoting *Faughender v. City of N. Olmsted*, 927 F.2d 909, 913 (6th Cir. 1991)). While making this determination does not depend on the plaintiff's actual job duties, those duties "may nonetheless serve as evidence of the duties inherent in the position." *Id.* (quoting *Feeney v. Shipley*, 164 F.3d 311, 320 (6th Cir. 1999)). The Supreme Court has held that *Elrod* and *Branti* apply to patronage promotion and hiring practices as well as to dismissals. *Rutan v. Republican Party of Ill.*, 497 U.S. 62 (1990).

In *McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996), the Sixth Circuit outlined four categories of government positions that will always qualify for patronage exceptions: (1) those that are specifically named in a relevant statute or that are charged with the discretionary authority to carry out the law or other policy of political concern; (2) a position to which discretionary decisionmaking of the first category has been delegated; (3) confidential advisors who spend a significant amount of their time advising category-one employees on how to exercise their statutory policymaking authority, or other employees who control the lines of communications to category-one employees; and (4) positions filled to balance out party representation.

The burden of proof for patronage cases was set forth in *Branti*. First, a plaintiff must make out a *prima facie* case that she was discharged (or, in this case, not rehired) because of political affiliation. *Branti*, 445 U.S. at 518; *see also Faughender*, 927 F.2d at 915 (citing the plurality in *Elrod*, 427 U.S. at 367). If the plaintiff succeeds in making that showing, the defendant must then show that the position is of a type that would qualify for an exception to the rule against patronage dismissals. *Id*.

Initially, there is some confusion as to whether Summe made out a *prima facie* case that the decision not to rehire her was based on her political affiliation. Below, Eldridge assumed for summary judgment purposes that Summe was able to make her *prima facie* case. In granting summary judgment, the district court assumed she had established her *prima facie* case. On appeal, Summe asserts that she did in fact establish a *prima facie* case of patronage dismissal, while Eldridge denies that political affiliation had anything to do with his decision, and that he fired her because of her management skills.

Lest there be any doubt about this question, we find that Summe established a *prima facie* case that Eldridge's decision not to rehire her was based on her political affiliation. The undisputed evidence shows that the seven employees Eldridge dismissed supported Summe's campaign and Eldridge knew it. He required all employees in the office to submit their applications for rehire to him, but he never interviewed any of them and does not remember anything about their applications. Although Eldridge "intended to increase the efficiency and fiscal responsibility of the office by decreasing the number of employees in the Clerk's Office" (R. 26-2 ¶ 8), he replaced the seven people he fired with thirteen campaign supporters and/or contributors. He offered them jobs without requiring them to file applications or allowed them to file late applications. He gave the new employees larger salaries than the incumbent clerks, and he gave the incumbent clerks who supported him considerably larger raises than those who did not. He made the salary decisions before entering office and could not explain the basis for the salary disparities. Based on the undisputed evidence, we conclude that Summe established a *prima facie* case that Eldridge fired her based on her political affiliation.

### 1.     *McCloud* Category-Two Position

Having made that determination, we must next decide whether Eldridge showed that Summe's position falls within any of the *McCloud* exceptions. The district court determined that Summe's position as Chief Deputy was a *McCloud* category-two position. To show that a plaintiff falls within a *McCloud* category-two position, the defendant must show that the position is one to which a significant amount of the total

discretionary authority available to category-one employees has been delegated. *McCloud*, 97 F.3d at 1557. In reaching the conclusion that the position of Chief Deputy is a category-two position, the district court found that County Clerk Aylor had delegated a substantial part of his discretionary authority to Summe. She reported directly to Aylor, instituted and implemented the cross-training program, altered employee lunch hours and assigned employees to different stations and locations.

The record supports the district court's finding and we agree with the district court's conclusion. In an affidavit filed in support of Eldridge's summary judgment motion, Aylor averred that he delegated a portion of his discretionary authority as Kenton County Clerk to Summe in her position as his Chief Deputy. (R. 26-3 ¶ 5.) He avers that it was his intention in appointing her as his Chief Deputy, "and in fact [she] did, take over the responsibility for running various aspects of the Clerk's Office on a day to day basis subject only to [his] final authority." (R. 26-3 ¶ 3.) He avers that she "instituted a 'cross-training program,' reassigned personnel, promoted and demoted personnel, changed starting times, lunch breaks and vacations, subject to [his] final approval." (Id. ¶ 4.) The deposition testimony of Summe and her co-workers supports Aylor's averments.

Summe argues that her position as Chief Deputy does not fall within the second *McCloud* category for three reasons: 1) her duties did not change after she was appointed Chief Deputy; 2) she was nothing more than a supervisor with a glorified title; and 3) she should be treated the same as Donna Wood, a supervisor of deputy clerks in the Kenton County Clerk's real estate department, whom the district court concluded, in the companion case, was not a *McCloud* category-two employee.

Addressing the last argument first, the district court's decision in the companion case does not support Summe's claim that her position as Chief Deputy is not a *McCloud* category-two position. *See Davis v. Kenton County Clerks Office*, No. 2007-67 (WOB), 2009 WL 1684410 (E.D. Ky. Jun. 16, 2009). Donna Wood's duties as supervisor of the real estate department were similar to Summe's duties as supervisor of the Independence office. *Id.* at *4. The court found that Wood was responsible for maintaining employee

time records, approving leave requests, answering questions and making decisions on some issues that arose in her department, but leaving major decisions to the County Clerk. *Id.* The district court concluded that there was no evidence that Wood's position fell within the second *McCloud* category because there was no evidence that any discretionary authority was delegated to her regarding the enforcement of a law or the carrying out of a policy of political concern. *Id.*

The difference between Wood and Summe is that Summe was not just the supervisor of the Independence office, she was the Chief Deputy County Clerk. The undisputed evidence, supported by Summe's own testimony, establishes that she was appointed by Aylor to the position of Chief Deputy primarily to run the cross-training program – a duty she did not have when she was supervising the Independence office. As Chief Deputy, Summe spent the majority of her time in Covington working on the cross-training program, although she spoke daily to Linda Trenkamp who oversaw the Independence office in her absence. There is some evidence that cross-training was an idea that ruminated in the Clerk's office prior to Summe's appointment, and it is undisputed that Aylor had the final authority on Summe's recommendations. However, the evidence shows that Summe moved the idea from concept to action, and that she designed and implemented the program. Thus, we reject Summe's argument that she was nothing more than a supervisor with a glorified title whose duties did not change after she was appointed Chief Deputy, and that she should be treated similarly to Donna Wood.

Summe argues that her position as Chief Deputy cannot be classified as a *McCloud* category-two position because the position of County Clerk is not a category-one position. We disagree. The position of County Clerk is established by the Kentucky Constitution. It is an elected position with a term of four years. Pursuant to the Kentucky Revised Statutes, County Clerks are responsible for issuing motor vehicle, marriage and vending licenses, registering voters and performing other election-related duties, storing various legal and county records, and preparing county tax bills. Under *McCloud*, a category-one position is a position specifically named in federal, state,

county or municipal law to which discretionary authority with respect to enforcement of that law is granted. 97 F.3d at 1557. County Clerks are charged with enforcing the law regarding the issuance of licenses, the registration of voters and the running of elections, and the storage and maintenance of legal and governmental records. County Clerks presumably have discretionary authority regarding how to facilitate these numerous and varied duties. We, thus, conclude that the position of County Clerk is a *McCloud* category-one position.

Summe argues that the position of County Clerk is not a category-one position based on the Fifth Circuit's decision in *Stegmaier v. Trammell*, 597 F.2d 1027, 1035-38 (5th Cir. 1979). The *Stegmaier* decision, which is not binding on us, addressed the position of Cherokee County, Alabama, Circuit Court Clerk. The Fifth Circuit's ruling that the Circuit Court Clerk did not occupy a category-one position was based on applicable Alabama constitutional and statutory provisions reflecting that policymaking decisions regarding the operation of Alabama's unified judicial system must be made by the Administrative Director of the courts, and not the Circuit Court Clerk. The State of Kentucky has its own unified court system established by Kentucky's constitution, and County Clerks perform no services for Kentucky's courts. Furthermore, there is no comparable Kentucky statute placing  discretionary authority for running the County Clerk's office in another administrator. Thus, *Stegmaier* does not form a basis for this court to conclude that the Kenton County Clerk is *not* a *McCloud* category-one position.

Summe argues that her position as Chief Deputy cannot be a *McCloud* category-two position because Aylor did not delegate any of his authority relative to the carrying out of a policy of political concern. This argument ignores the disjunctive language in *McCloud* that also holds that a position falls within the second category if a category-one employee delegates his available discretionary authority relative to the enforcement of the law to the position in question.

In any event, we find that the design and implementation of the cross-training program involved the carrying out of a policy of political concern. The goal of the program was to improve customer service, foster employee growth and satisfaction and,

in the end, make voters happy. Even Eldridge testified that streamlining the office's operations and providing better customer service was fundamental to his campaign. He testified that he intended to accomplish this goal by closing the Automobile Renewals office, moving the employees into the Titles and Transfers office – in other words, by cross-training employees to perform all duties. Aylor delegated to Summe nearly all authority in running the program. Indeed, Summe testified that if she had been elected, she would have run the program as County Clerk.

For all these reasons, we **AFFIRM** the district court's ruling that the position of Chief Deputy County Clerk in Kenton County, Kentucky falls within the second *McCloud* category and is, thus, lawfully subject to patronage dismissal.

### 2.     *McCloud* **Category-Three Position**

The district court also concluded that the position of Chief Deputy County Clerk is an inherently confidential one. *McCloud* category-three employees are confidential advisors who spend a significant portion of their time on the job advising category-one employees on how to exercise their statutory authority with respect to enforcement of laws or the carrying out of some policy of political concern. Or they may be other employees who control the lines of communications to category-one employees. *McCloud*, 97 F.3d at 1557.

The undisputed evidence shows that the position of Chief Deputy in Kenton County is an ad hoc position. That is, the position is one that exists entirely at the whim of the County Clerk who defines the Chief Deputy's job duties. Donna Wood, who worked in the County Clerk's office for 26 years, testified that Aylor's predecessor, Albert Wood, appointed two Chief Deputies (Bill Bauereis followed by Ruth Eger) during his administration. Wood testified that Aylor retained Eger as his Chief Deputy when elected, but she left shortly thereafter to be a stay-at-home mother. The evidence shows that Aylor did not appoint anyone to replace Eger until years later when he appointed Summe to the position. Summe testified that, if she won the election, she did not plan to appoint a Chief Deputy. And Eldridge did not appoint a Chief Deputy until

four  months after he entered office.  Thus, the evidence shows that the Chief Deputy serves, if at all, at the behest of the County Clerk.

The evidence also shows that the duties of a Chief Deputy in Kenton County, if one is appointed, are defined entirely by the County Clerk.  Wood testified that Chief Deputies Baureis and Eger "took care of the hiring, the firing, the lunch hours, the – [they] took care of the business end of everything." (R. 32 at 26.)  The evidence shows that Summe was appointed Chief Deputy primarily to create and run the cross-training program.  Summe testified that, if she were elected County Clerk, she would transfer the cross-training duties to herself, and she acknowledged that "there is no job description for the position of Chief Deputy County Clerk in the record."  (Appellant's Br. at 20.) We are unable to find any case where the position in question is as improvised and ill-defined as this one.  We conclude, on this record, that the position and duties of Chief Deputy County Clerk in Kenton County are sufficiently indefinite that the County Clerk can safely redefine those duties without running afoul of the law.

Here, Eldridge testified that he envisioned the position of Chief Deputy as one occupied by a confidential advisor who could help facilitate his policy, and control the lines of communication to him.  Although Summe points to evidence showing that there are many things Danny Miles does not do,[3] there is absolutely no evidence that he is not a confidential advisor to Eldridge who controls the lines of communication to him. Moreover, there is nothing in the record that prevents a Kenton County Clerk from employing a Chief Deputy in a way that requires confidentiality, and we hesitate to bind Kenton County Clerks to employ their Chief Deputies in ways that they were employed in the past. *See Williams v. City of River Rouge*, 909 F.2d 151, 154-55 (6th Cir. 1990). Thus, we **AFFIRM** the district court's conclusion that the position of Chief Deputy is also a *McCloud* category-three position.

---

[3]Summe observes, for example, that:

> "[Miles] doesn't help with tax bills and doesn't deal with any of the reports that go to the state.  Eldridge has "never discussed with him" whether he has authority to hire or fire or has any purchasing power. [R. 39 Eldridge depo, pg. 123]"

(Appellant's Br. at 34.)

### 3.        Qualified Immunity

The district court further ruled that Eldridge's dismissal of Summe was protected by qualified immunity.  Summe correctly points out that Eldridge did not raise the issue of qualified immunity in either of his briefs below, and the district court raised the issue *sua sponte* in its memorandum of opinion.

Qualified immunity protects government officials performing discretionary duties from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Morrison v. Board of Trustees of Green Tp.*, 583 F.3d 394, 399 (6th Cir. 2009) (citing *Feathers v. Aey*, 319 F.3d 843, 847 (6th Cir. 2003), in turn quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  Qualified immunity is an affirmative defense that must be pleaded and proved by the defendant. *Balderaz v. Porter*, 578 F.Supp. 1491, (S.D. Ohio 1983) (citing *Alexander v. Alexander*, 706 F.2d 751, 754 (6th Cir. 1983).  The failure to raise qualified immunity results in waiver of the defense.  *Narducci v. Moore*, 572 F.3d 313 (7th Cir. 2009) (holding that the failure to raise qualified immunity before the reply brief constituted a waiver of that defense in summary judgment proceedings); *Guzman-Rivera v. Rivera-Cruz*, 98 F.3d 664 (1st Cir. 1996) (holding that the failure to raise qualified immunity defense in defendants' first two summary judgment motions constituted waiver of that defense in their third summary judgment motion).

The record below shows that, although Eldridge raised qualified immunity as an affirmative defense in his answer, he never raised it as a defense in his summary judgment motion and it was not briefed by the parties.  It is thus apparent that Eldridge was aware of the defense before discovery, had ample time to develop the defense during discovery, had the opportunity to present the defense on summary judgment and chose, instead, to address the patronage dismissal claim on the merits.  Because Eldridge waived the qualified immunity defense, we need not decide that issue on appeal.

**C.        Substantive Due Process Claim Against the County**

Summe alleges that the County violated her constitutional privacy rights by releasing her "medical records" to a citizen named David Sizemore, in response to his open records request, who then disseminated those records to the public. The County denies that the report it released is a medical record and argues that Summe failed to establish a constitutional violation. Although the district court opined that the EAP report was not a medical record, it assumed for purposes of the motion that the report was a medical record and concluded, nonetheless, that its dissemination by the County did not violate Summe's Fourteenth Amendment constitutional privacy rights.

The Supreme Court has identified two types of interests protected by the substantive due process right to privacy. *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008) *rehearing and rehearing en banc denied* (July 14, 2008). The first is the interest in making certain kinds of important decisions independently (for example, those relating to procreation, marriage and contraception). *Id.* (citing *Whalen v. Roe*, 429 U.S. 589 (1977)). The second is the interest in avoiding disclosure of personal matters (otherwise known as the informational-privacy right). *Id.* (citing *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 465 (1977)). The Sixth Circuit has narrowly construed the informational-privacy right to apply only to those personal rights that can be deemed fundamental or implicit in the concept of ordered liberty. *Id.* (citations omitted). As such, the Sixth Circuit has recognized this right in only two cases: (1) where the release of personal information could lead to bodily harm, as in *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), and (2) where the information released was of a sexual, personal and humiliating nature, as in *Bloch v. Ribar*, 156 F.3d 673, 683 (6th Cir. 1998). The Sixth Circuit has determined that, only after a fundamental right is identified should the court proceed to the next step of the analysis, i.e., balancing the government's interest in disseminating the information against the individual's interest in keeping the information private. *Lambert*, 517 F.3d at 440 (citation omitted).

In *Kallstrom*, the plaintiffs were undercover police officers who were actively involved in a drug-conspiracy investigation of a notoriously violent gang and who

testified against a number of the gang's members. During the trial, the city released the officers' records to defense counsel. The records contained the names and addresses of the officers, their immediate family members, and their personal references. The *Kallstrom* court concluded that the officers' privacy interests were of a constitutional dimension because they implicated a fundamental interest in preserving their lives, the lives of their family members, their personal security and their bodily integrity.

In *Bloch*, the Sixth Circuit determined that the plaintiff, a rape victim, established an informational-privacy right had been violated when a sheriff held a press conference during which he released highly personal and extremely humiliating details of the rape, some of which were so embarrassing the plaintiff had not even told her husband. The court found that the sheriff's publication of the details implicated the plaintiff's right to be free from governmental intrusion into matters touching on sexuality and family life. The *Kallstrom* and *Bloch* courts found that the dissemination in those cases stripped away the plaintiffs' very essence of personhood.

Here, the district court found that Summe failed to show facts sufficient to establish that the release of the EAP report implicated a Fourteenth Amendment informational-privacy right that rose to the level of *Bloch* or *Kallstrom*. In reaching this conclusion, the court also observed that Summe's individual privacy rights were further diminished since she was running for public office – an activity that necessarily limits one's privacy expectations.

We agree. The release of the EAP report by the County does not rise to the conscience-shocking level of conduct established in *Kallstrom*, where the plaintiffs' lives were jeopardized by the government, or *Bloch*, where the government intruded into matters touching on the plaintiff's sexuality and family life. Accordingly, we **AFFIRM**.

## D.    First Amendment Retaliation Claim Against the County

Summe also argues that the County retaliated against her for exercising her First Amendment right to run for office by releasing the EAP report. Our review of the complaint, however, shows that Summe did not assert a First Amendment retaliation

claim against the County based on dissemination of this report. In order to establish a First Amendment retaliation claim, a plaintiff must show that: 1) she engaged in protected conduct; 2) an adverse action was taken against her; and 3) the adverse action was motivated, at least in part, by the protected conduct. *Harbin-Bey v. Rutter*, 420 F.3d 571, 579 (6th Cir. 2005).

Count I, the only count alleging a constitutional violation asserts, with respect to dissemination of the EAP report:

> 52.   Summe has a legitimate expectation of privacy in her medical records.
>
> 53.   The Fiscal Court's disclosure of Plaintiff's medical records did not serve a compelling governmental interest and was done to assist Eldridge in his campaign.
>
> 54.   The Fiscal Court could have achieved its objectives in a less intrusive manner.
>
> 55.   The disclosure violated Plaintiff's constitutional privacy rights.

(R. 1 ¶¶ 52-55.) These allegations only assert a claim for violation of Summe's Fourteenth Amendment substantive due process privacy rights, not a First Amendment retaliation claim. Summe raised the First Amendment retaliation claim for the first time in her opposition to the summary judgment motion. The County, which did not address the unasserted claim in its summary judgment motion, pointed this out to the district court in its reply brief. Nonetheless, the district court addressed Summe's argument and denied the claim on the merits. We find that the retaliation claim was not properly presented to the district court and that the district court should not have considered it. Thus, we decline to entertain it on appeal. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552-54 (6th Cir. 2008); *Chandler v. Johnson*, 813 F.2d 773, 777 (6th Cir. 1987).

## IV.    CONCLUSION

Based on the foregoing, we **AFFIRM** the district court's conclusion that the position of Chief Deputy County Clerk in Kenton County, Kentucky, falls within the second and third *McCloud* exceptions to unlawful patronage dismissal, and the district

court's dismissal of Summe's substantive due process claim.   For reasons stated, we decline to rule on the issue of qualified immunity and Summe's First Amendment retaliation claim.