NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0448n.06

No. 10-1992

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 01, 2011*

LEONARD GREEN, Clerk

THOMAS A. O'CONNOR,

      Plaintiff-Appellee,

v.

TOWNSHIP OF REDFORD,
TRACEY SCHULTZ KOBYLARZ,

      Defendants-Appellants.

_____/

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

BEFORE:    KEITH, CLAY, and COOK, Circuit Judges.

    **CLAY, Circuit Judge.**  Defendant Tracey Schultz Kobylarz takes an interlocutory appeal of the denial of her motion for summary judgment on the basis of qualified immunity in this First Amendment retaliation action under 42 U.S.C. § 1983. For the reasons set forth below, we **AFFIRM.**

BACKGROUND

    Plaintiff Thomas O'Connor is the former Director of Constituent Services for the Township of Redford, Michigan ("Township"). Defendant Tracey Kobylarz is the current Township Supervisor ("Supervisor"). From 1986 until 1999, Plaintiff was the director of youth services for the Township. After his resignation, he worked in private sector public relations, and ran a

community newspaper, *The Redford Connection*. In or about 2000, Plaintiff ran for Supervisor, but lost the election to Kevin Kelly ("Kelly").

In November of 2004, Miles Handy II ("Handy") succeeded Kelly as Supervisor following an election campaign in which Plaintiff assisted Handy. After the election, the Township Board of Trustees ("Board") hired Plaintiff as a "transition coordinator," in an independent contractor capacity, to "meet and compile ideas from [] the entire staff in all the departments and to provide the board a report on the findings." (Pl.'s Dep. at 25.)

In March of 2005, the Board created, and appointed Plaintiff to, the position of Director of Constituent Services ("Director"). The parties dispute whether the position was created specifically for Plaintiff.

As enacted by the Board, the Municipal Code ("Code") defines the position as follows:

(a) The department of constituent services shall be responsible for the general supervision and coordination of services rendered by the following departments: parks and recreation, senior citizens and veterans, senior citizens' housing, Diala-Ride, youth services, and community development. The day-to-day operations of the various departments, however, shall be the responsibility of the heads of those departments.

(b) The head of the department of constituent services . . . shall be designated the director of constituent services and shall be appointed by the township board. The director of the department shall be the liaison between the township board and those departments under his general supervision and will also be responsible for outreach on residential roads, sidewalk, and Brownfield projects.

(c) The director of constituent services shall have general knowledge of the day-to-day operations of the township. The director shall have at least ten years' experience working for a municipality and be able to work well with senior citizens and youth. The director must possess previous department head experience and must be flexible to provide the supervision necessary to help the various departments function as a cohesive unit.

(Ord. No. 261, Red. Mun. Code, art. IV, div. I, § 2-81.) Plaintiff testified that his experience as Director "operated" as described in the Code. (Pl.'s Dep. at 21-24.) He further noted that on a day-to-day basis, he would report to the administration committee, consisting of the Supervisor, treasurer, and clerk, but that he would ultimately report to the Board itself. (*Id.* at 35.) When asked about his interactions with then-Supervisor Handy, Plaintiff testified: "I would see him at least several times a week . . . . [T]here's a lot of . . . showing him what we were up against in terms of the problems, so there was a lot of riding together and there was [sic] certainly lunches and also meetings in his office." (*Id.* at 29-30.)

Additionally, Plaintiff testified that "a lot" of his role was "fielding complaints from residents, so a lot of it was inbound calls, and there was also our outbound outreach through the different programs and then specifically with relationship to the road program that was direct mailings." (*Id.* at 24.) Plaintiff added that he was involved in "advocating or handling evaluations on some of the staff. Also there were several board members that were more hands on and wanted to go and look at problems, so bringing them with me to meet residents." (*Id.* at 25.)

Defendant explained that the Director "was supposed to be the liaison between constituents and the Township Supervisor, I believe, fielding calls and complaints." (Def.'s Dep. at 12-13.) Defendant recounted having meetings with Plaintiff, as Director, for the purpose of being "informed of issues, concerns, programs, projects, everything that you would meet with a department head about." (*Id.* at 13.) Some of these meetings concerned the budget. (*Id.*)

Plaintiff assisted Handy with his reelection campaign in 2008, but Handy lost to Defendant, who assumed office in November of 2008. The parties dispute how much Plaintiff assisted Handy in his reelection efforts.

According to Plaintiff, once Defendant took office, she made it clear to Plaintiff that she did not trust him and that his job was in jeopardy because of his association with and support of Handy. Plaintiff contends that Defendant sought to manipulate Plaintiff to "use his political contacts both for her own benefit and to get her initiative[s] passed." (Pl.'s Br. at 8.) On one occasion, as alleged, Plaintiff refused Defendant's request to ask a state representative to extend her an invitation to the Governor's State of the State Address on February 2, 2009.

In a letter dated February 5, 2009, Defendant informed Plaintiff that he was being laid off, effective immediately, and that his position "has been eliminated." According to Defendant, "[n]obody was hired to replace [Plaintiff], and his minimal duties were redistributed among other Township employees." (Def.'s Aff. ¶ 8.) Defendant did not seek approval from the Board to terminate Plaintiff. Defendant cited economic conditions as the reason for her actions. It appears that other Township employees were laid off on or around the same time. On February 25, 2009, the Board voted, 5 to 2, to eliminate the position of Director of Constituent Services.

On February 18, 2009, Plaintiff filed a complaint in the Wayne County Circuit Court against Defendant Kobylarz, as well as the Township, alleging unlawful retaliation under 42 U.S.C. § 1983 and Michigan common law. Defendants removed this action to the U.S. district court pursuant to 28 U.S.C. §§ 1331 and 1441. On August 13, 2009, following Defendant's motion to dismiss, the district court dismissed Plaintiff's state common law claim.

On March 2, 2010, Defendants filed a motion for summary judgment, which the district court denied on June 30, 2010. The district court held that material factual disputes existed as to whether Plaintiff was terminated because of his political beliefs, and therefore summary judgement was not appropriate on Plaintiff's First Amendment claim. The district court also found that Defendants had not sufficiently supported their position that Plaintiff's employment was of a type that could be terminated for political reasons. Furthermore, the district court held that qualified immunity was inappropriate. Defendant Kobylarz thereafter filed this interlocutory appeal of the district court's denial of qualified immunity.

## DISCUSSION

Defendant takes this interlocutory appeal of the district court's denial of summary judgment on the basis of qualified immunity.

### A.      Jurisdiction

As an initial matter, we note our jurisdiction to entertain this interlocutory appeal. The denial of qualified immunity is an appealable "final decision" for the purpose of 28 U.S.C. § 1291 to the extent the appeal turns on an issue of law. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). If the denial of qualified immunity turns on an issue of fact, this Court is without jurisdiction to resolve the claim. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995). In this case, the questions to be decided, namely whether a particular job is entitled to First Amendment protection from patronage dismissals, and whether the law was sufficiently unclear to entitle Defendant to qualified immunity, are legal questions over which this Court's jurisdiction extends. *See Lane v. City of LaFollette, Tenn.*, 490

F.3d 410, 418 (6th Cir. 2007); *Sowards v. Loudon County, Tenn.*, 203 F.3d 426, 435 (6th Cir. 2000); *McCloud v. Testa*, 97 F.3d 1536, 1546 (6th Cir. 1996) (hereinafter "*McCloud I*").

## B. Standard of Review & Qualified Immunity Standard

We review the denial of qualified immunity *de novo*. *See Kindle v. City of Jeffersontown, Ky.*, 374 F. App'x 562, 569 (6th Cir. 2010) (citing *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 825 (6th Cir. 2007)). Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In determining whether an official is entitled to qualified immunity, courts ordinarily apply a two step analysis. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) (holding that the two-step inquiry is not mandatory, but may often be appropriate). First, we consider whether, "[t]aken in the light most favorable to the party asserting the injury[,] . . . the facts alleged show [that the official's] conduct violated a constitutional right." *Scott v. Harris*, 550 U.S. 372, 377 (2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, if a constitutional right has been violated, we ask "whether the right was clearly established . . . in light of the specific context of the case." *Id.* (quoting *Saucier*, 533 U.S. at 201). "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (internal citations omitted).

## C. Analysis

We begin, and end, with the question of whether, viewed in the light most favorable to Plaintiff, the facts alleged show that Defendant's conduct violated a constitutional right. *See Harris*, 550 U.S. at 377. Plaintiff claims a violation of the his rights under the First Amendment to be free from dismissal based on his political beliefs or affiliation.

The First Amendment generally proscribes the termination of a public employee based on the employee's political beliefs or affiliation. *See Elrod v. Burns*, 427 U.S. 347, 349 (1976); *Caudill v. Hollan*, 431 F.3d 900, 908 (6th Cir. 2005) (noting that after *Elrod*, "patronage dismissals (i.e., dismissals for failure to support a particular party or candidate) have been, in general, unconstitutional"). As we explained in *Lane*:

> Allowing the government to deny a benefit to an individual because that individual exercised his First Amendment rights presents two principal dangers. First, the inevitable tendency of a system of party patronage is to coerce employees into compromising their true political beliefs. The second danger . . . is that the denial of a government benefit on account of [] political beliefs is in effect a penalty for holding those beliefs; permitting the state to impose such a penalty would constitute an "unconstitutional condition" that would allow the state to indirectly interfere with an employee's constitutional rights in a manner that it could not accomplish directly.

*Lane*, 490 F.3d at 419-20 (citing, *inter alia*, *Branti v. Finkel*, 445 U.S. 507, 513-14 (1980)).

Despite the costs of patronage dismissals, courts recognize an exception to the general rule; in certain cases, "party affiliation may be an acceptable requirement for some types of government employment." *Branti*, 445 U.S. at 517. These so-called exempt positions are frequently referred to as "policymaking," "inherently political" or "confidential," although the legal standard for classifying a position as exempt does not depend on the label. *See id.* at 518; *Summe v. Kenton County Clerk's Office*, 604 F.3d 257, 265 (6th Cir. 2010) (chief deputy county clerk); *Rose v.*

*Stephens*, 291 F.3d 917, 924-25 (6th Cir. 2002) (police commissioner); *Hoard v. Sizemore*, 198 F.3d

205, 214 (6th Cir. 1999) (road foreman).

The dispositive test is "whether the hiring authority can demonstrate that party affiliation is

an appropriate requirement for the effective performance of the public office involved." *Lane*, 490

F.3d at 419 (internal quotation marks and citation omitted); *see also Justice v. Pike County Bd. of

Educ.*, 348 F.3d 554, 559 (6th Cir. 2003). In this regard, we "examine the inherent duties of that

position and the duties that the new holder of that position will perform." *Summe*, 604 F.3d at 265

(quoting *Baker v. Hadley*, 167 F.3d 1014, 1018 (6th Cir. 1999)). This determination does not depend

on the plaintiff's job duties as performed, but those duties "may nonetheless serve as evidence of the

duties inherent in the position." *Id.* (internal quotation marks and citation omitted).

In *McCloud I*, this Court "outlined four categories of government positions that will always

qualify for patronage exceptions," namely:

> (1) those that are specifically named in a relevant statute or that are charged with the
> discretionary authority to carry out the law or other policy of political concern; (2)
> a position to which discretionary decisionmaking of the first category has been
> delegated; (3) confidential advisors who spend a significant amount of their time
> advising category-one employees on how to exercise their statutory policymaking
> authority, or other employees who control the lines of communications to
> category-one employees; and (4) positions filled to balance out party representation.

*Summe*, 604 F.3d at 265 (citing *McCloud I*, 97 F.3d at 1557).

In considering a claim of patronage dismissal in violation of the First Amendment, the Court

looks to the framework first set forth by the Supreme Court in *Branti v. Finkel,* 445 U.S. 507, 513-14

(1980). *See Lane*, 490 F.3d at 419. First, the plaintiff must make out a prima facie case that he was

discharged because of political affiliation. *See Summe*, 604 F.3d at 265. Second, if the plaintiff

makes the requisite showing, the burden shifts to the defendant to show that the position "is of a type that would qualify for an exception to the rule against patronage dismissals." *Id.*

In this case, as to the first question, we find that Plaintiff has presented a prima facie case of patronage dismissal in violation of the First Amendment. As the district court properly found, "there is a fact question as to whether [Plaintiff's expressive] activities were casually related to the adverse action." (Dist. Ct. Op. at 14.) The parties dispute the reason for Plaintiff's termination; Defendant claims it was due to budget constrains, while Plaintiff asserts that it was politically motivated. Sufficient evidence exists in the record to support either of these theories. For instance, the termination letter stated that the layoff was for economic reasons, and indeed other employees were similarly laid off, but Plaintiff testified as to Defendant's political animosity towards him, and has provided other evidence suggesting that the financial picture of the Township was not so bleak.

Because Plaintiff has presented sufficient facts to support his claim, the burden shifts to Defendant to show that the position of Director is exempt from First Amendment scrutiny because political affiliation is an appropriate consideration for the position. *See Branti,* 445 U.S. at 517. Having reviewed the record, we conclude that factual disputes prevent resolution of this question as a matter of law. The record neither discloses the inherent duties of the Director of Constituent Services, nor the specific responsibilities of the position as envisioned by Defendant. Thus we cannot conclude that Defendant has "demonstrated that party affiliation is an appropriate requirement for the effective performance of the public office" of Director of Constituent Services. *See id.*

To begin, the record is silent about whether (and if so, how) the Township classifies positions of public employment, such as the Director. *See Rice v. Ohio Dep't of Trans.*, 14 F.3d 1133, 1143

(6th Cir. 1994) (noting the relevance of official classifications). It is unclear whether the Township distinguishes between political and nonpolitical employees, or whether some or all of the Township's employees are considered to be part of the civil service. Both Plaintiff and Defendant referred to the "civil service" in their depositions, but the meaning of this phrase is not explained in the record. (Pl.'s Dep. at 61, 88; Def.'s Dep. at 18.) Plaintiff characterized some employees as part of the civil service, and Defendant stated that she informed the "Civil Service Personnel Director" of the reason for Plaintiff's layoff. (Def.'s Dep. at 18.) The record also suggests that a Civil Service Commission may have power to create certain positions, but this is similarly unexplained. (*Id.* at 25, 29.)

The only suggestion in the record of the Director's employment classification comes from an excerpt from the *Handbook for Board of Trustees Appointed Employees* ("Handbook"). Only one of twenty-six total pages of the Handbook is contained in the record, but that one page seems to suggest that the Handbook applies to a subset of employees that are "appointed." Plaintiff, as Director, received the Handbook, which would suggest that the Director is an appointed employee. However, as the district court noted, it is "not entirely clear" that this is the case. (Dist. Ct. Op. at 15 n.3.) The Handbook states that the Supervisor has the authority to terminate an "appointee," which the Supervisor purported to do by terminating Plaintiff on February 5, 2009. But this termination may not have been effective; the Board minutes dated February 25, 2009 list Plaintiff as the current Director, suggesting that Defendant may have lacked the independent authority to terminate Plaintiff when she purported to do so weeks earlier.

It is true that the Code defines the qualifications and responsibilities for the position of Director. But what the Director "actually does" is not clearly defined on in the Code. *See Lane*, 490 F.3d at 421. The responsibilities in the Code consist of vague, largely undefined descriptions, for example: 1) "supervision" and "coordination" of departmental services, but not day-to-day management, 2) "liais[ing]" between the Board and various municipal departments; and 3) "outreach" on community projects. Though relevant, *see Latham v. Office of Att'y Gen. of State of Ohio*, 395 F.3d 261, 268 (6th Cir. 2005), these job descriptions are too vague to be dispositive on the question of whether political affiliation is necessary for the effective functioning of the position. It is not even clear whether the Supervisor, or the Board, or both, have the authority to "redefine" the duties of the Director. *See Summe*, 604 F.3d at 269 (finding that a deputy county clerk was not protected from politically motivated dismissal where the duties of the position were "defined entirely" by the county clerk).

Without any guidance from the Code, the inherent duties of the position are left to be defined by the parties, who offer competing, conclusory, and self-interested accounts of the Director's duties. The record lacks, for instance, third party affidavits, testimony, or other evidence about the position that might assist in resolving this question. Defendant argues that the Director "served as the line of communication between the Township Supervisor, public officials and the members of the public. He was essentially the eyes and ears of the Township Supervisor with regard to the condition of the Township roads and other matters." Plaintiff describes the position more narrowly, testifying that "a lot" of his role was "fielding complaints from residents." Yet neither party offers any facts, beyond their own conclusory testimony, to prove their assertions. To the extent the Director

11

performed "essential services," as Defendant argues on appeal, those services are ill-defined in the record and their description rests solely on the statements of the parties.

Additionally, the record is unclear about how much authority, if any, the Director had to implement or craft public policy. In fact, the record is devoid of any information about the location, distribution, and/or delegability of policymaking authority within the Township. *See Lane*, 490 F.3d at 421-23 (noting the relevance of these facts).

The record makes references to the Director's participation in budget meetings, and other meetings, for the purpose of being informed about "issues, concerns, programs, projects, everything that you would meet with a department head about." Yet it is entirely unclear what the Director would do at these meetings, or what type of authority, if any, the Director would have to implement the discussions that took place at the meetings. Although Plaintiff testified, upon Defendant's counsel's questioning, that the Director had discretion in handling constituent complaints, it is altogether unclear what this means in the context of this case. *See Murphy v. Cockrell*, 505 F.3d 446, 454 (6th Cir. 2007) (opining that discretion comes in different forms, and not all discretionary authority is sufficient to bring a position outside of the protections of the First Amendment); *Cagle v. Headley*, 148 F. App'x 442, 446 (6th Cir. 2005) (same).

Relatedly, it is unclear whether (and if so, to what extent) the Director served as a confidential employee or advisor to the Board, or members thereof, including the Supervisor. Plaintiff testified that he consulted with the Supervisor, and had numerous interactions with the Board, but the substance and import of these communications is unclear. The precise nature of the relationship between Plaintiff and then-Supervisor Handy is also unclear.

Similar to the ambiguous relationship between the Director, Board, and Supervisor is the uncertainty surrounding the chain of command. *See Hall v. Tollett*, 128 F.3d 418, 429 (6th Cir. 1997) (noting the relevance of chain of command). Simply stated, it is not clear to whom the Director reported. The Code does not answer that question. Plaintiff describes the Director as reporting to a committee and the Board itself. Defendant implies that the Director reports to the Supervisor by acting as the Supervisor's direct liaison. Related to this ambiguity is the lack of clarity surrounding whether the Director had his own staff, and if so, whether he had authority over their employment. *See McCloud v. Testa*, 227 F.3d 424, 429 (6th Cir. 2000) (hereinafter "*McCloud II*") (stating that discretionary authority over employees suggests that the position is not subject to patronage dismissal).

Based on this record, we hold that Defendant has not carried her burden to show that political affiliation is an appropriate requirement for the position of Director, "because the duties of [that position] remain too ill-defined for us to adjudicate the issue as a matter of law." *Lane*, 490 F.3d at 422 (citing *McCloud I*, 97 F.3d at 1558 ("[I]n the situation where the inherent duties of the plaintiffs' positions are not apparent and the facts are not yet fully developed, it is not possible for us to decide, when reviewing in an interlocutory posture the denial of a motion for summary judgment, whether a defendant should be granted qualified immunity with respect to those positions.")).

The limited evidence in the record is conclusory, vague, and contradictory, and fails to "address the actual job functions of the [Director] in the specific and detailed manner that is necessary for us to decide the legal issue presented in this case." *Id.* at 423. *Compare Hager v. Pike*

13

*County Bd. of Educ.*, 286 F.3d 366, 373 (6th Cir. 2002) (finding that protection against patronage dismissal applies to an employee who "performs solely ministerial tasks with no policymaking functions") *with Hoard v. Sizemore*, 198 F.3d 205, 214 (6th Cir. 1999) (finding that protection against patronage dismissal does not apply to a position of which the "nature" is "inherently political").

Because the dispute in this case stems from "obscurities in the facts, not the law," *McCloud I*, 97 F.3d at 1558, we **AFFIRM** the denial of summary judgment on the basis of qualified immunity.[1]

## CONCLUSION

For the reasons set forth above, we conclude that the district court did not err in denying summary judgment to Defendant on the basis of qualified immunity. The decision below is therefore **AFFIRMED.**

---

[1]The parties also dispute whether any unlawful conduct violated "clearly established" law. It is well settled that a right is clearly established if a reasonable official would understand that what he is doing violates that right. *See Harlow*, 457 U.S. at 818; *Hoover v. Radabaugh*, 307 F.3d 460, 468 (6th Cir. 2002). In this case, given the outstanding factual issues described above, Defendant "cannot prevail at this stage of the litigation by relying upon the deference afforded to reasonable decisions under the doctrine of qualified immunity." *Lane*, 490 F.3d at 422 n.3 (declining to reach question of whether the law was clearly established where the facts giving rise to the claimed violation were unclear). Although Defendant may be entitled to qualified immunity "if the illegality of the[] alleged decision to terminate Plaintiff for his political beliefs was unclear under the law as it existed at the time," *id.*, factual issues prevent such a determination at this time. *See, e.g., McCloud II*, 227 F.3d 424.